## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

DAVID MILLET,
1313 New York Ave N.W.
Washington, D.C. 20005


               Plaintiff,

  v.

DISTRICT OF COLUMBIA
c/o Mayor and Office of the Attorney General
for the District of Columbia
400 6th Street, N.W.
Washington, D.C. 20001

And

PETER APOLLON, Badge No. 12371#2440
Metropolitan Police Department Officer
c/o Office of the Attorney General for the
District of Columbia
400 6th Street NW
Washington, D.C. 20001

And

THE COMMUNITY PARTNERSHIP FOR
THE PREVENTION OF HOMELESSNESS
801 Pennsylvania Ave S.E., Suite 360
Washington, D.C. 20003

And

PRINCE SECURITY SERVICES OF D.C.,
LLC
401 Nicholson Street, NW
Washington, D.C. 20011

And

DARRELL HARRIS, JR.,
Special Police Officer

Case No. 1:23-cv-572_____

**JURY TRIAL DEMANDED**

1

SPO License No. 202163
c/o Prince Security Services of D.C., LLC
401 Nicholson Street, NW
Washington, D.C. 20011

AND

JOHN DOES 1-3
Special Police Officers
Identities unknown[1]
c/o Prince Security Services of D.C., LLC
401 Nicholson Street, NW
Washington, D.C. 20011

                                        Defendants.

## COMPLAINT FOR DAMAGES

1.      MR. DAVID MILLET, Plaintiff, by and through his counsel, brings this action

against Defendants: MPD Officer Peter Apollon (Badge No. 12371#2440) ("MPD Defendant" or

"Defendant Apollon"); Special Police Officers ("SPOs") Darrell Harris, Jr. (SPO License No.

202163, John Doe 1, John Doe 2, and John Doe 3 ("Individual SPO Defendants"); Prince Security

Services of D.C., LLC. ("Prince Security"); The Community Partnership for the Prevention of

Homelessness ("TCP"); and the District of Columbia ("D.C."), for unlawfully stopping, seizing

and arresting Mr. Millet without justification and with excessive force in violation of his federal

constitutional rights and District of Columbia law. In support of the Complaint, Mr. Millet alleges

the following:

---

[1] The exact identities of these three Defendant JOHN DOES are unknown. The undersigned intend
to confer with Defendant Prince Security Services of D.C., LLC, and request their consent to
limited expedited discovery to obtain the Doe Defendant's identities.

## NATURE OF THE ACTION

2.     DAVID MILLET is an unhoused Black man who has spent the last few years living in various D.C. shelters as he awaits placement in long-term housing.[2]

3.     On the freezing night of March 4, 2022, Mr. Millet was trying to fall asleep in the Trinidad Recreation Center (then serving as an overnight cold emergency shelter) by quietly playing music on his phone to drown out another guest's yelling. The Individual SPO Defendants asked Mr. Millet to leave the premises because of his music, and he complied. However, when Mr. Millet kicked a cot in frustration on the way out, the Individual SPO Defendants jumped Mr. Millet, taking him to the ground and punching him in the face over and over again. They then arrested him, placed him in handcuffs, and called the Metropolitan Police Department ("MPD") to falsely report that Mr. Millet had assaulted an officer. When MPD Defendant Apollon arrived, he took Mr. Millet into custody and transported him to the hospital for his injuries, including a bleeding and split lip. He placed Mr. Millet in extremely tight handcuffs and laughed and refused to loosen or remove them when Mr. Millet asked him to.

4.     After being treated at the hospital, Mr. Millet was detained an additional eight to twelve hours in Central Cell Block until his case was "no papered," meaning dismissed at the prosecution's direction.

5.      Despite years of reported abuses by SPOs in D.C., there is effectively no civilian oversight over SPOs like those who assaulted Mr. Millet. "While the Department of Consumer and Regulatory Affairs is responsible for licensing special police officers, that department stated

---

[2] The lack of affordable housing in D.C. is at crisis levels. The D.C. Housing Authority's affordable housing waitlist has 40,000 people waiting for housing vouchers, with voucher wait times as long as 15 years. *See* Annemarie Cuccia, *With 40,000 People On the D.C. Housing Authority Waitlist, D.C. Funds Only 20 New Vouchers for that List*, The DCist, June 24, 2022, *at* https://tinyurl.com/vtr6vsty.

in response to a FOIA request from the [Washington Lawyers'] Committee that neither they, nor their Security Officers' Management Branch, process complaints regarding special police officers."[3] When D.C. residents attempt to file complaints against SPOs with the MPD, they are turned away and informed that they should take it up with the private security company the SPO works for instead.[4] There is thus no meaningful accountability or oversight process for SPOs in the District.

6.     Mr. Millet now asks this Court to enter a judgment confirming that the Defendants are not above the laws they enforce, and that they will be held accountable for abusing their authority.

## **PARTIES**

7.     MR. MILLET is a resident of Washington, D.C.

8.     Individual SPO Defendants Darrell Harris, Jr., and John Does 1–3 are Special Police Officers and were, at all times relevant to this complaint, employees of Prince Security Services of D.C., LLC.

9.     Defendant Peter Apollon is an officer of the Metropolitan Police Department.

10.     At the time of the events at issue, Individual SPO Defendants and MPD Defendant Apollon were acting within the scope of their employment and under color of D.C. law. They are sued in their individual capacities.

---

[3] *Testimony of Jacqueline Kutnik-Bauder, Deputy Legal Director, Washington Lawyers' Committee for Civil Rights and Urban Affairs*, Before the Council of the District of Columbia, Committee on the Judiciary and Public Safety and the Committee of the Whole Concerning Special Police Officers in the District of Columbia and Proposed Legislation, Feb. 17, 2022, *at* https://tinyurl.com/2ne6a3bw.

[4] *See* Jodie Fleischer, *D.C. Residents Say MPD Ignored Complaints Against Special Police Officer*, NBC Washington, Apr. 1, 2019, *at* https://tinyurl.com/ye24p76u.

11.     Defendant the Community Partnership for the Prevention of Homelessness ("TCP") is a 501(c)(3) organization with a business address registered with the Department of Consumer Regulatory Affairs of 801 Pennsylvania Ave S.E., Suite 360, Washington, D.C., 20003. TCP's registered agent is Kim Kendrick, at the same address. On information and belief, at all relevant times, the D.C. Department of Human Services ("DHS") contracted with TCP to provide management oversight for the District's homeless services Continuum of Care.[5]

12.     Defendant Prince Security Services of D.C., LLC., is a limited liability company with a business address registered with the Department of Consumer Regulatory Affairs of 401 Nicholson Street N.W., Washington, D.C., 20011.[6] Prince Security's registered agent is Curtis Prince, Sr., at the same address. Defendant Prince Security employs SPOs and, on information and belief, at all relevant times, sub-contracted with TCP to provide security services at D.C. shelters for unhoused people.  At the time of the incident at issue here, Prince Security employed the Individual SPO Defendants.

13.     Defendant District of Columbia is a municipal corporation and the local government of Washington, D.C. It operates and governs MPD and DHS, which are *non sui juris* entities, pursuant to the laws of the District of Columbia. In this case, the District acted through its agents, employees, and servants, including the MPD Defendant and the Individual SPO Defendants.

---

[5] *See* D.C. Code § 4-753.01, *at* https://tinyurl.com/56hsj3rs; *see also* The Community Partnership for the Prevention of Homelessness, *Site Visit and Program Monitoring Guide*, Sept. 2021, *at* https://tinyurl.com/bdhvdueu; The Community Partnership for the Prevention of Homeless, *Privacy Policy*, *at* https://tinyurl.com/452m6yrb.
[6] *See* Prince Security Services, *at* http://princesecurity.com (last visited Feb. 18, 2023).

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action presents federal questions. This Court also has jurisdiction under 28 U.S.C. § 1343 because the action seeks to redress the deprivation of rights under the Fourth Amendment to the U.S. Constitution, pursuant to 42 U.S.C. § 1983.

15.     Plaintiff's claims under the law of the District of Columbia arise from the same events as the constitutional claims and are therefore within the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

16.     Venue is proper in this Court because the events that give rise to this action occurred in the District of Columbia.

17.     This Court has personal jurisdiction over Defendants because they were employed or contracted by the District of Columbia during all times relevant to this Complaint, and they were engaged in the relevant conduct in the District of Columbia.

## STATEMENT OF FACTS

18.     DAVID MILLET is a 39 year old unhoused Black man who has struggled to survive in D.C. and has sought safety in various D.C. shelters as he pursues stable housing.

19.     On any given night, there are over 3,400 single persons experiencing homelessness in Washington, D.C.[7]

20.     Evening temperatures in D.C. during the month of March often drop to near or below freezing. The weather on the evening of March 4, 2022, was reportedly 34 degrees fahrenheit, near freezing.[8]

---

[7] *See* The Community Partnership for the Prevention of Homelessness, *at* https://tinyurl.com/yeysz72y, last visited Feb. 14, 2023.
[8] *See* World Weather, Weather in Washington, D.C. in Mar. 2022, https://tinyurl.com/yuczjuvz.

**On March 4, 2022, Special Police Officers Serving as Overnight Shelter Security Jumped, Tackled, and Repeatedly Punched Mr. Millet.**

21.     As temperatures and darkness fell on the evening of March 4, 2022, Mr. Millet went to the Trinidad Recreation Center, an overnight cold emergency shelter.

22.     After Mr. Millet was admitted to the shelter, he lay down on one of the military cots the shelter provides for guests.

23.     Another shelter guest soon began shouting, but the SPOs on patrol did nothing to quiet him or address the noise.

24.     The Individual SPO Defendants patrolled the property and surveyed the residents at the Trinidad Recreation Center with the authority to manage and expel any unwanted or unauthorized persons.

25.     Trying to fall asleep, Mr. Millet quietly played music on his phone, placed next to his head, to drown out the shouting.

26.     The Individual SPO Defendants patrolling the Trinidad Recreation Center that evening did nothing to quiet the shouting man in the Center.

27.     Instead, the Individual SPO Defendants ordered Mr. Millet to turn his music down, which Mr. Millet did.

28.     Despite the fact that Mr. Millet complied, shortly thereafter, around 9:00 pm or 10:00 pm, the Individual SPO Defendants told Mr. Millet that he had to leave.

29.     Mr. Millet again complied with the SPOs' order and began leaving the premises.

30.     As Mr. Millet was leaving the Center, he kicked an unoccupied military cot out of frustration.

31.     The unoccupied cot landed on its side and did not hit anyone.

32.     The cot itself was not damaged in any way.

33.     Suddenly, unprovoked and untouched in any way, the four Individual SPO Defendants responded by attacking Mr. Millet, jumping on his back, shoving him to the ground and pushing their knees into his back.

34.     For no reason, one Individual SPO Defendant then punched Mr. Millet several times in the face, splitting his lip.

35.     The Individual SPO Defendants then arrested Mr. Millet and placed him in handcuffs.

36.     The Individual SPO Defendants then detained Mr. Millet for approximately 25 minutes in those handcuffs and called MPD officers to falsely report that Mr. Millet had assaulted an officer.

### MPD Officer Apollon Arrests Mr. Millet, Cuffs Him Too Tightly, and Laughs at His Pain and Injuries

37.     Around 10:00 pm Defendant Apollon arrived.

38.     Defendant Apollon spoke to the Individual SPO Defendants but did not at any point interview or ask any questions of Mr. Millet.

39.     He kept Mr. Millet in handcuffs for approximately 15 minutes before he called an ambulance.

40.     When the ambulance arrived 15 minutes later, Defendant Apollon then took Mr. Millet, still in handcuffs, to the hospital to receive treatment for his bleeding lip.

41.     In the ambulance, Defendant Apollon removed the SPO handcuffs and put on different handcuffs, but these handcuffs were too small for Mr. Millet and thus too tight.

42.     Mr. Millet complained that his cuffs were too tight and asked Defendant Apollon to loosen them, but Defendant Apollon did not loosen or remove them. Instead, he laughed at Mr. Millet as he lay there cuffed and bleeding.

43.     Once at the hospital, Defendant Apollon kept Mr. Millet in handcuffs for an additional hour before removing them so that hospital staff could medically examine Mr. Millet.

44.     Defendant Apollon arrested Mr. Millet for assault on a police officer.

45.     After being treated at the hospital, Mr. Millet was detained an additional eight to twelve hours in Central Cell Block until his case was "no papered," meaning later dismissed at the prosecution's direction.[9]

46.     Mr. Millet was never taken to court to face any charges because the prosecution declined to prosecute him.

47.     Mr. Millet felt pain in his wrists, back, neck, and legs long after the incident.

**Mr. Millet's Ongoing Physical Injuries and Suffering**

48.     As a result of the abuse inflicted by the Individual SPO Defendants and Defendant Apollon, Mr. Millet suffers ongoing harm.

49.     Three adult male Individual SPO Defendants put their full body weight on Mr. Millet's back, pressing their knees into him as he lay on the ground.

50.     A fourth Individual SPO Defendant repeatedly punched Mr. Millet in the face while he was pinned down by the three other Individual SPO Defendants, splitting Mr. Millet's lip.

51.     Mr. Millet experienced immediate and severe pain in his neck, back, and wrists during the incident.

52.     At the hospital, Mr. Millet required several stitches for his split lip.

53.     Defendant Apollon subjected Mr. Millet to additional pain by putting him in handcuffs that were too small and too tight.

---

[9] "If an arrest charge(s) is 'no papered,' it means that the USAO or OAG has decided not to prosecute and the defendant is released if that defendant has no other pending matters. In C-10, each defendant whose arrest charge(s) has been 'no papered' will receive an information sheet that explains "no papering" more fully." *See* http://dccourts.gov/node/559.

54.     For days after the incident, Mr. Millet could not feel his hands.

55.     Weeks after the incident, Mr. Millet's wrists ached and began to swell. The swelling spread to his entire forearm.

56.     For weeks afterwards, Mr. Millet had to wear a wrist brace.

57.     As a result of the excessive force used, Mr. Millet suffered pain in his wrists, back, and face both during and for several months after the incident.

58.     To this day, Mr. Millet has difficulty turning his head and lifting anything heavy.

59.     To this day, Mr. Millet is unable to work in construction due to his injuries.

60.     To this day, Mr. Millet's neck, back, and wrists ache.

61.     To this day, in the cold weather, Mr. Millet's aches increase, often leading to sharp pains.

62.     To this day, Mr. Millet experiences pain in his back every time he attempts to lift a heavy object or when he places pressure on his wrists.

**Mr. Millet Also Suffered and Continues to Suffer Financial and Emotional Injuries.**

63.     Mr. Millet's primary line of work is hard physical labor doing construction.

64.     Although Mr. Millet wanted to return to work, he has been unable to work in construction since the incident due to his physical injuries.

65.     Mr. Millet has resorted to donating blood plasma to financially provide for his two sons, ages five and seven, despite his fear of needles.

66.     Mr. Millet has experienced emotional distress as a result of this incident. The incident was so traumatizing that it is painful for Mr. Millet to discuss it.

67.     Mr. Millet still experiences fear and anxiety living in shelters and encountering their security staff.

68.     It upsets Mr. Millet that he still cannot provide much financially to his two young sons.

69.     Mr. Millet still uses the D.C. shelter system.

70.     Since the March 4, 2022 incident, Mr. Millet has seen at least one of the Individual SPO Defendants working in another shelter and felt extremely fearful upon seeing him.

## BACKGROUND ON SPECIAL POLICE OFFICERS IN THE DISTRICT OF COLUMBIA

71.     SPOs are empowered by the District of Columbia under D.C. Code § 23-582(a) with "the same powers as law enforcement officers to arrest without warrant for offenses committed within premises to which [their] jurisdiction extends."

72.     SPOs are appointed by the Mayor under D.C. Code § 5-129.02(a) to patrol a property of a corporation or individual.

73.     Applications for the appointments of SPOs, under D.C. Municipal Regulation ("DCMR") 6-A1105.1 are made jointly in the names of the prospective SPOs and the names of the persons or corporations in connection with whose property of business the appointment is sought.

74.     Although appointed by the Mayor, under D.C. Code § 5-129.02(a), SPOs are to be "paid wholly by the corporation or person on whose account their appointments are made."

75.     The agencies and employers that employ SPOs have an affirmative duty under DCMR6-A1106.2 to supervise special police officers in their employ.

76.     Organizations that employ SPOs may receive a registration certificate for firearms under D.C. Code § 7-2502.01.

77.     The Individual SPO Defendants were, at all times relevant to this Complaint, SPOs employed by Defendant Prince Security Services and appointed to patrol the Trinidad Recreation Center.

## BACKGROUND ON SHELTER SERVICES IN THE DISTRICT

78.     DHS is responsible for caring for the unhoused people that rely on its shelter services. Despite DHS's mandate, the agency has repeatedly been accused by shelter guests and advocacy groups of turning a blind eye to inhumane shelter conditions as well as abusive treatment by shelter staff and security contractors.[10]

79.     Under D.C. Code Section 4–754.11, all DHS shelter guests have "the right to at all times be treated by providers and [DHS] with dignity and respect" and to "access services…free from verbal, emotional, sexual, financial, and physical abuse and exploitation."

80.     DHS's Homeless Services Monitoring Unit–within the Office of Program Review, Monitoring and Investigation (OPRMI)–is responsible for "monitor[ing] shelters and services provided by the District and its contractors to its unhoused clients." D.C. Code § 4–754.51. This monitoring is supposed to include attention to the health, safety, and cleanliness of shelters as well as contractors' compliance with the provider standards established by D.C. Code Sections 4-754.21 through 4-754.25.

---

[10] *See* DHS Homeless and Homelessness Prevention Services, *at* https://tinyurl.com/3xjcauhx; *see also* Justin Jouvenal, Robert Samuels and DeNeen L. Brown, *D.C. Family Homeless Shelter Beset by Disfunction, Decay*, The Wash. Post, July 12, 2014, *at* https://tinyurl.com/yc35mx6z; Will Lennon, *Protesters to Bowser: Reform the Department of Human Services*, Street Sense Media, Aug. 28, 2020, *at* https://tinyurl.com/45f4dr4n; Athiyah Azeem, *Low-Barrier Shelter Residents Say Staff Abuse Them Amid 'Terrible' Conditions During COVID-19*, Street Sense Media, Oct. 15, 2020, *at* https://tinyurl.com/2p8f9v33.

81.     OPRMI accepts and is obligated to investigate "unusual incident reports" about its contractors and providers through an online "Incident Report Form" and hotline.[11]

82.     On information and belief and at all relevant times, DHS contracted with The Community Partnership for the Prevention of Homelessness ("TCP") to manage the operation of Trinidad Recreation Center as an overnight cold emergency shelter.

83.     TCP conducts site visits to ensure that its subcontractors are in compliance with the terms of their contracts with TCP.

84.     TCP also conducts regular, in-depth work audits of its security subcontractors  and mandates that shelter SPOs participate in trainings led by TCP staff.

85.     TCP requires all of its subcontractors to submit incident reports to TCP within 24 hours of a physical altercation between a client and security personnel.

86.     On information and belief and at all relevant times, Defendant TCP sub-contracted with Prince Security to provide SPOs to patrol the Trinidad Recreation Center property, including the Individual SPO Defendants.

87.     On information and belief, DHS and TCP staff actively directed Prince Security SPOs assigned to the Trinidad Recreation Center, including directing them to certain locations on the property and directing them to address various security issues and incidents.

88.     On information and belief, DHS and TCP staff actively directed Prince Security SPOs to identify and investigate incidents, report incidents and individuals to DHS and TCP staff, and report which individuals should be barred or expelled from the property by patrolling the property and individuals on the property.

---

[11] *See* DHS Incident Report Form, *at* https://tinyurl.com/5n85rhn4, last visited Mar. 1, 2023; DC DHS website, *at* https://tinyurl.com/2p9ucvf2, last visited Mar 1, 2023.

89.     On information and belief, DHS and TCP staff actively directed Prince Security SPOs to forcibly evict, if necessary, any individual the SPOs determined to be unwanted, a security threat, or otherwise unauthorized to be on the premises.

## COMPLIANCE WITH D.C. CODE § 12-309

90.     Plaintiff has satisfied the requirements of D.C. Code § 12-309.

91.     Regarding the March 4, 2022 incident, on September 8, 2022, Plaintiff, by and through counsel, notified and filed claim number GL-22-005222 with the District of Columbia's Office of Risk Management, informing the District of the approximate time, place, cause, and circumstances of the injuries and damages that Plaintiff suffered and continue to suffer. ORM acknowledged receipt of the complaint on September 9, 2022, but denied the claim on February 9, 2023.

92.     D.C. Code § 12-309 states that "[a] report in writing" by MPD "in regular course of duty" constitutes "sufficient notice" under this provision. As such, on information and belief, such a record was made for the March 4, 2022 incident and constitute sufficient notice for the purposes of D.C. Code § 12-309.

## CLAIMS FOR RELIEF

93.     As to each claim below, Plaintiff realleges and incorporates by reference the preceding allegations in this Complaint as if fully set forth herein.

## COUNT ONE
## Violation of the Fourth Amendment: Unlawful Seizure
### *Against the Individual SPO Defendants*

94.     Mr. Millet asserts this count under 42 U.S.C. § 1983 against all Individual SPO Defendants.

95.     The Individual SPO Defendants are jointly and severally liable for arresting and detaining Mr. Millet without probable cause.

96.     The Individual SPO Defendants were at all relevant times state actors and persons acting under color of state law within the meaning of Section 1983: they are commissioned by the D.C. government to exercise police powers, and were at all relevant times acting within the scope of their official duties as well as exercising police powers afforded to them by law. Furthermore, they were actively involved in the constitutional violations alleged herein. *See Woodward & Lothrop v. Hillary*, 598 A.2d 1142, 1145 (D.C. 1991).

97.     When the Individual SPO Defendants, approached Mr. Millet in uniform, violently seized and assaulted him and placed him in handcuffs, they seized Mr. Millet under the color of law. The Individual SPO Defendants had no legal, articulable basis to suspect that Mr. Millet had committed, was committing, or was about to commit any crime, but rather seized Mr. Millet in response to him kicking an unoccupied military cot which was undamaged and which did not in any way touch, nearly touch, or threaten any of the officers or fellow shelter residents.

98.     The Individual SPO Defendants cuffed him and then unlawfully detained him for approximately 25 minutes while waiting for MPD to arrive.

99.     The Individual SPO Defendants knew that they did not have a legal basis to detain Mr. Millet, but did so anyway.

100.     The Individual SPO Defendants' conduct occurred under color of law and violated Mr. Millet's rights under the Fourth Amendment.

## COUNT TWO
### Failure to Intervene Regarding Violation of the Fourth Amendment: Unlawful Seizure
*In the Alternative to Count One Against Individual SPO Defendants*

101.     Mr. Millet asserts this count under 42 U.S.C. § 1983 in the alternative to Count One against Individual SPO Defendants.

102.    The Individual SPO Defendants were at all relevant times state actors and persons acting under color of state law within the meaning of Section 1983 because they are commissioned by the D.C. government to exercise police powers, and were at all relevant times acting within the scope of their official duties as well as exercising police powers afforded to them by law. Furthermore, they were actively involved in the constitutional violations alleged herein. *See Woodward*, 598 A.2d at 1145.

103.    Individual SPO Defendants were at all times present in uniform while Mr. Millet was unlawfully and unreasonably stopped and seized.

104.    To the extent any of the Individual SPO Defendants did not participate in the unlawful and unreasonable seizure of Mr. Millet, they witnessed their fellow SPOs seize Mr. Millet in violation of his Fourth Amendment rights, knew or had reason to know that their fellow SPOs were committing a Constitutional violation, had a reasonable opportunity to prevent the unlawful and unreasonable seizure by intervening to protect Mr. Millet, and failed to do so.

105.    The conduct of the Individual SPO Defendants occurred under color of law and violated Mr. Millet's rights under the Fourth Amendment.

## COUNT THREE
### Violation of the Fourth Amendment: Excessive Force
#### *Against the Individual SPO Defendants*

106.    Mr. Millet asserts this count under 42 U.S.C. § 1983 against all Individual SPO Defendants.

107.    The Individual SPO Defendants are jointly and severally liable for using excessive force against Mr. Millet.

108.    The Individual SPO Defendants were at all relevant times state actors and persons acting under color of state law within the meaning of Section 1983 because they are commissioned

by the D.C. government to exercise police powers, and were at all relevant times acting within the scope of their official duties as well as exercising police powers afforded to them by law. Furthermore, they were actively involved in the constitutional violations alleged herein. *See Woodward*, 598 A.2d at 1145.

109.     The Individual SPO Defendants, in uniform, jumped on Mr. Millet's back, tackled him to the ground, shoved their knees and weight on Mr. Millet while he was on the ground, punched him several times in the face, splitting his lip, and cuffed him.

110.     Mr. Millet did not engage in any criminal conduct.

111.     Mr. Millet was not a threat to the safety of the SPOs, himself nor others.

112.     Mr. Milet had a clearly established constitutional right under the Fourth Amendment to be secure in his person from unreasonable seizure through the excessive force of being knocked to the ground, punched in the face several times while not resisting and while being pinned on the ground by three SPOs pressing their knees into his back.

113.     The Individual SPO Defendants' actions and use of force were objectively unreasonable in light of the facts and circumstances.

114.     After the incident, Mr. Millet could not feel his hands for days, and his wrists ached and swelled weeks after and required a wrist brace. Mr. Millet suffered pain in his wrists, back and face both during and for several months after the incident. To this day, Mr. Millet's neck, back and wrists ache, and he has difficulty lifting anything heavy, thus preventing him from working in construction.

115.     The Individual SPO Defendants' conduct occurred under color of law and violated Mr. Millet's rights under the Fourth Amendment.

## COUNT FOUR

### Failure to Intervene Regarding Violation of Fourth Amendment: Excessive Force

*In the Alternative to Count Four Against Individual SPO Defendants*

116.    Mr. Millet asserts this count under 42 U.S.C. § 1983 in the alternative to Count Four against Individual SPO Defendants.

117.    The Individual SPO Defendants were at all relevant times state actors and persons acting under color of state law within the meaning of Section 1983: because they are commissioned by the D.C. government to exercise police powers, and .were at all relevant times acting within the scope of their official duties as well as exercising police powers afforded to them by law. Furthermore, they were actively involved in the constitutional violations alleged herein. *See Woodward*, 598 A.2d at 1145.

118.    Individual SPO Defendants were at all times present in uniform while Mr. Millet was subjected to excessive force.

119.    To the extent any of the Individual SPO Defendants did not participate in the excessive force used against Mr. Millet, they witnessed their fellow officers exercise excessive force against Mr. Millet in violation of his Fourth Amendment rights, knew or had reason to know that their fellow officers were committing a Constitutional violation, had a reasonable opportunity to prevent the excessive force by intervening to protect Mr. Millet, and failed to do so.

120.    The conduct of the Individual SPO Defendants occurred under color of law and violated Mr. Millet's rights under the Fourth Amendment.

## COUNT FIVE

### Violation of the Fourth Amendment: Excessive Force

*Against the MPD Defendant*

121.    Mr. Millet asserts this count under 42 U.S.C. § 1983 against Defendant Apollon.

122.    Defendant Apollon, in uniform and armed, seized Mr. Millet and replaced his existing cuffs with new cuffs that were too tight, refused to loosen or remove them, and laughed at Mr. Millet while he was bleeding and in pain.

123.    Mr. Millet did not engage in any criminal conduct.

124.    Mr. Millet was not a threat to the safety of Defendant Apollon, himself nor others.

125.    Mr. Milet had a clearly established constitutional right under the Fourth Amendment to be secure in his person from unreasonable seizure through excessive force.

126.    Defendant Apollon's actions and use of force were objectively unreasonable in light of the facts and circumstances.

127.    After the incident, Mr. Millet could not feel his hands for days, and his wrists ached and swelled weeks after and required a wrist brace. Mr. Millet suffered pain in his wrists, back and face both during and for several months after the incident. To this day, Mr. Millet's neck, back and wrists ache, and he has difficulty lifting anything heavy, thus preventing him from working in construction.

128.    The Defendant Apollon's conduct occurred under color of law and violated Mr. Millet's rights under the Fourth Amendment.

## COUNT SIX
### Violation of D.C. Common Law: Assault and Battery
*Against Individual SPO Defendants, the District of Columbia, TCP, and Prince Security*

129.    Mr. Millet asserts this count under D.C. common law against Individual SPO Defendants, the District of Columbia, TCP, and Prince Security.

130.    The Individual SPO Defendants, the District of Columbia, TCP, and Prince Security are jointly and severally liable for the assault and battery committed on Mr. Millet through both word and act.

131.    Unprovoked, Individual SPO Defendants intentionally tackled, punched, knelt with their knees on, and handcuffed Mr. Millet.

132.    As a result of this assault, Mr. Millet suffered substantial harm, including but not limited to mental and emotional distress.

133.    At all relevant times during the circumstances described in this Complaint, Individual SPO Defendants were acting within the scope of their duty as SPOs appointed pursuant to D.C. Code § 5-129.02 and employed by Prince Security.

134.    Prince Security is liable under the doctrine of *respondeat superior* for the actions of its agents, including the Individual SPO Defendants, who acted within the scope of their employment as SPOs and on behalf of and in the interests of their employers.

135.    On information and belief, Prince Security was subcontracted by TCP, which was, in turn, contracted by the District (through its agency, DHS) to keep shelter guests and staff at Trinidad Recreation Center safe and secure.

136.    TCP and the District have and exercise the power to control the conduct of the SPOs employed by Prince Security, placing the SPOs in an agent-principle or master-servant relationship with TCP and the District.

137.    In the alternative, TCP and the District are liable under the doctrine of apparent agency, because TCP and the District each represent to the public that shelter SPOs, including the Individual SPO Defendants, are their agents and that they are trained, screened, and managed accordingly.

138.    187. In the alternative, TCP and DHS retain liability over the acts of their independent contractor, Prince Security, and its agents, because the SPOs' work at Trinidad Recreation Center implicates TCP's and DHS's non-delegable duties to their shelter guests.

## COUNT SEVEN

### Violation of D.C. Common Law: Assault and Battery

*Against the Individual MPD Defendant and the District of Columbia*

139.    Mr. Millet asserts this count under D.C. common law against Defendant Apollon and against the District of Columbia under the doctrine of *respondeat superior*.

140.    The Defendant Apollon intentionally handcuffed Mr. Millet's wrists too tightly, refused to loosen or remove the cuffs when Mr. Millet told him they were too tight, and laughed at him while he was bleeding and in pain.

141.    As a result of this assault, Mr. Millet suffered substantial harm, including but not limited to mental and emotional distress.

142.    Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the actions of its agents, including Defendant Apollon, who acted within the scope of his employment as an MPD officer and on behalf of and in the interests of his employer.

## COUNT EIGHT

### Violation of D.C. Common Law: False Imprisonment

*Against the Individual SPO Defendants, District of Columbia, TCP and Prince Security*

143.    Mr. Millet asserts this count under D.C. common law against Individual SPO Defendants, the District of Columbia, TCP and Prince Security.

144.    The Individual SPO Defendants are jointly and severally liable for falsely imprisoning Mr. Millet by tackling him to the ground as he was leaving the Trinidad Recreation Center, handcuffing him and detaining him, all with no valid basis or warrant.

145.    Mr. Millet was held against his will by the Individual SPO Defendants until MPD arrived and was detained and handcuffed in total for approximately 25 minutes due to the Individual SPO Defendants' unlawful actions.

146.    As a result of this false imprisonment, Mr. Millet suffered substantial harm, including but not limited to emotional distress.

147.    Prince Security is liable under the doctrine of *respondeat superior* for the actions of its agents, including the Individual SPO Defendants, who acted within the scope of their employment as SPOs and on behalf of and in the interests of their employers.

148.    On information and belief, Prince Security was subcontracted by TCP, which was, in turn, contracted by the District (through its agency, DHS) to keep shelter guests and staff at Trinidad Recreation Center safe and secure.

149.    TCP and the District have and exercise the power to control the conduct of the SPOs employed by Prince Security, placing the SPOs in an agent-principle or master-servant relationship with TCP and the District.

150.    In the alternative, TCP and the District are liable under the doctrine of apparent agency, because TCP and the District each represent to the public that shelter SPOs, including the Individual SPO Defendants, are their agents and that they are trained, screened, and managed accordingly.

151.    187. In the alternative, TCP and DHS retain liability over the acts of their independent contractor, Prince Security, and its agents, because the SPOs' work at Trinidad Recreation Center implicates TCP's and DHS's non-delegable duties to their shelter guests.

## <u>COUNT NINE</u>
### <u>Intentional Infliction Of Emotional Distress</u>

*Against Individual SPO Defendants, District of Columbia, TCP and Prince Security*

152.    Mr. Millet asserts this count under D.C. common law against Individual SPO Defendants, the District of Columbia, TCP and Prince Security.

153.    The Individual SPO Defendants are jointly and severally liable for their intentional and/or reckless, extreme, and outrageous conduct. By violently attacking Mr. Millet unprovoked, tackling him to the ground, pushing their knees into his back, punching him repeatedly in the face splitting his lip, and cuffing him, the Individual SPO Defendants intended to cause or recklessly caused Mr. Millet to fear for his safety. Their conduct was extreme and outrageous by any standard of decency.

154.    As a result of the Individual SPO Defendants' intentional or reckless acts, Mr. Millet suffered and continues to suffer severe emotional distress. Mr. Millet must still use the D.C. shelter system. On one occasion he saw one of the Individual SPO Defendants at another shelter and felt very afraid. Mr. Millet now becomes incredibly fearful and anxious seeing any SPOs in the shelters he visits, and he still experiences humiliation from the violent incident.

155.    Prince Security is liable under the doctrine of *respondeat superior* for the actions of its agents, including the Individual SPO Defendants, who acted within the scope of their employment as SPOs and on behalf of and in the interests of their employers.

156.    On information and belief, Prince Security was subcontracted by TCP, which was, in turn, contracted by the District (through its agency, DHS) to keep shelter guests and staff at Trinidad Recreation Center safe and secure.

157.    TCP and the District have and exercise the power to control the conduct of the SPOs employed by Prince Security, placing the SPOs in an agent-principle or master-servant relationship with TCP and the District.

158.    In the alternative, TCP and the District are liable under the doctrine of apparent agency, because TCP and the District each represent to the public that shelter SPOs, including the

Individual SPO Defendants, are their agents and that they are trained, screened, and managed accordingly.

159.   187. In the alternative, TCP and DHS retain liability over the acts of their independent contractor, Prince Security, and its agents, because the SPOs' work at Trinidad Recreation Center implicates TCP's and DHS's non-delegable duties to their shelter guests.

## COUNT TEN
### Intentional Infliction Of Emotional Distress
*Against the Individual MPD Defendant and the District of Columbia*

160.   Mr. Millet asserts this count under D.C. common law against Defendant Apollon and against the District of Columbia under the doctrine of *respondeat superior*.

161.   Defendant Apollon intentionally or recklessly engaged in extreme and outrageous conduct by handcuffing Mr. Millet too tightly, refusing to loosen or remove them at Mr. Millet's request, and laughing at Mr. Millet while he was in pain and bleeding. This conduct caused Mr. Millet to fear for his safety.

162.   As a result of the Defendant Apollon's intentional or reckless acts, Mr. Millet suffered and continues to suffer severe emotional distress. Mr. Millet now becomes incredibly fearful and anxious seeing MPD Officers, and he still experiences humiliation from the incident.

163.   Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the actions of its agents, including Defendant Apollon, who acted within the scope of his employment as an MPD officer and on behalf of and in the interests of his employer.

## COUNT ELEVEN

### Negligent Infliction Of Emotional Distress

*In the Alternative to Count Nine Against Individual SPO Defendants, the District of Columbia, TCP and Prince Security*

164.     Mr. Millet asserts this count under D.C. common law against Individual SPO Defendants, the District of Columbia, TCP and Prince Security.

165.     In the alternative to a finding of intentional infliction of emotional distress, the Individual SPO Defendants are jointly and severally liable for their negligent infliction of emotional distress upon Mr. Millet.

166.     By violently attacking Mr. Millet unprovoked, tackling him to the ground, pushing their knees into his back, punching him repeatedly in the face splitting his lip, and cuffing, the Individual SPO Defendants negligently caused Mr. Millet to fear for his safety.

167.     As a result of the Individual SPO Defendants' negligence, Mr. Millet suffered and continues to suffer severe emotional distress. Mr. Millet must still use the D.C. shelter system. On one occasion he saw one of the Individual SPO Defendants at another shelter and felt very afraid. Mr. Millet now becomes incredibly fearful and anxious seeing SPOs, and he still experiences humiliation from the violent incident.

168.     Prince Security is liable under the doctrine of *respondeat superior* for the actions of its agents, including the Individual SPO Defendants, who acted within the scope of their employment as SPOs and on behalf of and in the interests of their employers.

169.     On information and belief, Prince Security was subcontracted by TCP, which was, in turn, contracted by the District (through its agency, DHS) to keep shelter guests and staff at Trinidad Recreation Center safe and secure.

170.    TCP and the District have and exercise the power to control the conduct of the SPOs employed by Prince Security, placing the SPOs in an agent-principle or master-servant relationship with TCP and the District.

171.    In the alternative, TCP and the District are liable under the doctrine of apparent agency, because TCP and the District each represent to the public that shelter SPOs, including the Individual SPO Defendants, are their agents and that they are trained, screened, and managed accordingly.

172.    187. In the alternative, TCP and DHS retain liability over the acts of their independent contractor, Prince Security, and its agents, because the SPOs' work at Trinidad Recreation Center implicates TCP's and DHS's non-delegable duties to their shelter guests.

## COUNT TWELVE
### Negligent Infliction Of Emotional Distress

*In the Alternative to Count Ten Against the Individual MPD Defendant and the District of Columbia*

173.    Mr. Millet asserts this count under D.C. common law against Defendant Apollon and against the District of Columbia under the doctrine of *respondeat superior*.

174.    In the alternative to a finding of intentional infliction of emotional distress, Defendant Apollon is jointly and severally liable for his negligent infliction of emotional distress upon Mr. Millet.

175.    By cuffing him too tightly, refusing to loosen or remove the cuffs, and laughing at Mr. Millet while he the Individual MPD Defendant negligently caused Mr. Millet to fear for his safety.

176.    As a result of Defendant Apollon's negligence, Mr. Millet suffered and continues to suffer severe emotional distress. Mr. Millet now becomes incredibly fearful and anxious seeing MPDs, and still experiences humiliation from the incident.

177.     Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the actions of its agents, including the Individual MPD Defendant, who acted within the scope of their employment as an MPD officer and on behalf of and in the interests of their employer.

## REQUEST FOR RELIEF

178.     Defendants' flagrant disregard for their professional obligations, the rule of law, and Mr. Millet's basic dignity led to pain, fear, and material costs for Mr. Millet. Mr. Millet now asks the Court to enter a judgment confirming that Defendants are not above the laws they enforce and that they will be held accountable for abusing their authority.

179.     WHEREFORE, on the basis of the foregoing, Plaintiff demands a jury trial for all issues so triable pursuant to the Seventh Amendment of the United States Constitution and Federal Rules of Civil Procedure, and requests that this Court issue the following relief:

a. Declare that Defendants violated Mr. Millet's constitutional rights and rights under D.C. law;

b. Award compensatory damages against Defendants in an amount to be determined by a jury at trial, for the emotional distress, fear, embarrassment, humiliation, reputational damage, inconvenience, loss of income, and physical pain that Mr. Millet has suffered and continues to suffer as a result of these incidents;

c. Award punitive damages against Defendants for their willful and egregious violations of the law in an amount to be determined by a jury at trial;

d. Award reasonable attorneys' fees, expenses, and costs of litigation pursuant to 42 U.S.C. § 1988 and other applicable law;

e. Enter an appropriate injunction enjoining the Defendants from further deprivations of Mr. Millet's constitutional rights and rights under the District of Columbia law

and enjoining District of Columbia, TCP, and Prince Security from deploying SPOs

in a similar manner at the Trinidad Recreation Center; and

    f.   Award such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

March 1, 2023                                        Respectfully submitted,

*/s/* Bina Ahmad
Bina Ahmad (D.C. Bar No. 502839)*
Brittany Francis (D.C. Bar No. 90008960)*
Civil Rights Corps
1601 Connecticut Ave. NW, Ste 800
Washington, D.C. 20009
bina@civilrightscorps.org
brittany@civilrightscorps.org

*/s/* Robert Baldwin III
Robert Baldwin III (D.C. Bar No. 90002020)*
Virtue Law Group
1250 Connecticut Ave., Suite 700
Washington, District of Columbia 20036
robert@virtuelawgroup.com

*Counsel for Plaintiff*

* Appearing before this Court without
compensation from clients, pursuant to Local Civil
Rule 83.2(f).