## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DAVID MILLET,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 23-cv-00572 (AHA/GMH)** |
| **DISTRICT OF COLUMBIA, *et al*.,** | |
| **Defendants.** | |

## MAGISTRATE JUDGE'S
## <u>REPORT AND RECOMMENDATION</u>

Plaintiff David Millet alleges that law enforcement officers violated his rights under the Constitution and District of Columbia law when he was assaulted and arrested in March 2022 at the Trinidad Recreation Center (the "Center"), which was serving as an overnight cold emergency shelter.  As relevant here, he has sued four Special Police Officers (the "SPO Defendants") who arrested and detained him at the Center; Metropolitan Police Department ("MPD") Officer Peter Apollon, who handcuffed and transported him to the hospital after his arrest; and the District of Columbia (also referred to herein as the "District" or "D.C.").  Plaintiff alleges that Apollon violated the Fourth Amendment by using excessive force (Count Five) and violated District of Columbia common law by committing assault and battery (Count Seven) and intentional—or, in the alternative, negligent—infliction of emotional distress (Counts Ten and Twelve) when he fastened handcuffs too tightly around Plaintiff's wrists and refused to loosen or remove them; and that the District is liable for Apollon's common law torts under the doctrine of *respondeat superior* (Counts Seven, Ten, and Twelve).  He also alleges that the District is vicariously liable under various theories for the alleged assault and battery (Count Six), false imprisonment (Count Eight),

and intentional—or in the alternative, negligent—infliction of emotional distress (Counts Nine and Eleven) that the SPOs allegedly committed when they tackled, punched, knelt on, handcuffed, and detained Plaintiff prior to the arrival of Apollon.

The District and Apollon (together, the "Moving Defendants") have filed a motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure seeking dismissal of the counts against them. They contend that Plaintiff has not pleaded sufficient facts to show that Apollon used excessive force on Plaintiff or committed the asserted non-constitutional torts and that Plaintiff's arguments for imposing liability for the actions of the SPOs on the District are legally and/or factually defi-cient.[1]  For the reasons that follow, the motion should be granted in part and denied in part.  Spe-cifically, Plaintiff's theories that the District should be held vicariously liable for the actions of the SPOs should be rejected; his claims for intentional infliction of emotional distress and negligent infliction of emotional distress against the Moving Defendants should be dismissed; and his claims for excessive force and assault and battery against the Moving Defendants should survive.

## I.    BACKGROUND

### A.    Plaintiff's Factual Allegations[2]

The following facts are taken from the operative complaint, the well-pleaded allegations of which are taken as true for the purposes of a motion to dismiss.  *See, e.g.*, *Air Excursions LLC v. Yellen*, 66 F. 4th 272, 277 (D.C. Cir. 2023).  Plaintiff is an unhoused District of Columbia resi-dent who has spent recent years living in various shelters while awaiting placement in long-term

---

[1] The documents relevant to this Report and Recommendation are: (1) Plaintiff's First Amended Complaint, ECF No. 10; (2) the Moving Defendants' Motion to Dismiss, ECF No. 14; (3) Plaintiff's Opposition, ECF No. 15; (4) the Moving Defendants' Reply, ECF No. 17; and (5) Plaintiff's Sur-Reply, ECF No. 22, which the Court granted leave to file upon Plaintiffs' unopposed request, Minute Order (May 30, 2023).  The case numbers cited herein are those assigned by the Court's CM/ECF system.

[2] The allegations in this section are related to the conduct Plaintiff claims is tortious.  Allegations related to Plaintiff's theories of vicarious liability are set out in Section III.A., *infra*.

housing.  *See* ECF No. 10, ¶ 2.  During the period relevant here, the District had contracted with Security Assurance Management, Inc.,[3] to supply SPOs—who are officers, employed by private companies, empowered by the District to arrest individuals for offenses committed on the premises they have been appointed to patrol—to provide security at D.C.'s shelters for unhoused people. *See id.* ¶¶ 11, 70–71.  On March 4, 2022, Plaintiff was admitted to the Center, which was serving as an emergency overnight cold shelter.  *See id.*, ¶¶ 3, 21.  Later that night, the Defendant SPOs, who were appointed to patrol the Center, asked Plaintiff to leave the shelter, ostensibly because he had been playing music on his phone too loudly.  *See id.*, ¶¶ 23, 26–27, 76.  While leaving the shelter, Plaintiff kicked over an unoccupied cot in frustration.  *See id.*, ¶ 29.  No one was injured and the cot was not damaged.  *See id.*, ¶¶ 30–31.  Nevertheless, the Defendant SPOs allegedly "responded by attacking [Plaintiff], jumping on his back, shoving him to the ground and pushing their knees into his back," causing him "immediate and severe pain in his neck, back, and wrists." *Id.*, ¶¶ 32, 50.  One of them punched him several times in the face, splitting his lip.  *See id.*, ¶ 33. The Defendant SPOs then handcuffed Plaintiff, falsely reported to the MPD that Plaintiff had assaulted an officer, and detained Plaintiff for approximately 25 minutes while awaiting MPD assistance.  *See id.*, ¶¶ 34–35.

When Apollon arrived at the shelter and spoke to the Defendant SPOs, he arrested Plaintiff for assaulting one of them.  *See id.*, ¶¶ 36, 43. Apollon then called an ambulance, which arrived about fifteen minutes later.  *See id.* ¶¶ 38–39.  In the ambulance, Apollon removed the SPO handcuffs from Plaintiff's wrists and replaced them with his own, which were allegedly "too small for [Plaintiff] and thus too tight."  *Id.*, ¶ 40.  Plaintiff complained that the cuffs were too tight and asked for them to be loosened, but Apollon failed to loosen or remove them and instead "laughed

---

[3] Security Assurance Management has been sued here, too.  *See* ECF No. 10, ¶ 11.  However, the bulk of the allegations against it are not relevant to this motion to dismiss.

at [Plaintiff]." *Id.*, ¶ 41. Plaintiff remained handcuffed for about one hour at the hospital before Apollon removed them so medical staff could perform an examination. *See id.*, ¶ 42. Plaintiff received stitches for his split lip and was then transported to the Central Cell Block, where he was detained for eight to twelve hours before prosecutors decided not to charge him. *See id.*, ¶¶ 44, 51. For days after the incident, Plaintiff could not feel his hands; weeks after that, his wrists and, eventually, his forearm swelled. *See id.*, ¶¶ 53–54. He continues to experience pain in his wrists, back, and neck, which is exacerbated by cold weather, lifting heavy objects, and placing pressure on his wrists. *See id.*, ¶ 59–61. Plaintiff has also been unable to work in construction, which is his primary line of work, causing him to "resort[] to donating blood plasma"—despite his fear of needles—to provide for his two young sons. *Id.*, ¶ 62–64. He continues to feel humiliation from the incident and experiences fear and anxiety when he sees MPD officers. *See id.*, ¶¶ 159, 173.

## B.    Procedural History

Plaintiff initiated this case on March 1, 2023, and filed his First Amended Complaint—the operative complaint—on March 22, 2023. *See* ECF. Nos. 1, 10. In general, Plaintiff alleges that Apollon and the Defendant SPOs—and through them, the District of Columbia—"unlawfully stop[ed], seiz[ed], and arrest[ed] [Plaintiff] without justification and with excessive force in violation of his federal constitutional rights and District of Columbia law." ECF No. 10, ¶ 1. Counts One through Four allege that the Defendant SPOs unlawfully seized Defendant or, in the alternative, failed to intervene to protect Plaintiff from an unconstitutional seizure and that they used excessive force against the Plaintiff or, in the alternative, failed to intervene to protect Plaintiff from the unconstitutional use of excessive force. *See id.*, ¶¶ 91–117. Those claims are not directly at issue here. Count Five alleges that Apollon used excessive force in violation of the Fourth Amendment when he placed Plaintiff in handcuffs that were too tight and refused to loosen or

remove them. *See id.*, ¶¶ 118–125. As relevant here, Count Six alleges that the District, through the Defendant SPOs, is liable to Plaintiff for assault and battery under District of Columbia common law. *See id.*, ¶¶ 126–135. He contends that the District "exercises the power to control the conduct of the SPOs" such that it is liable for their actions under the doctrine of *respondeat superior*; that the District "represents to the public that shelter SPOs," including the Defendant SPOs, "are its agents and that they are trained, screened, and managed accordingly" such that it is liable for their conduct under the doctrine of apparent agency; and that the District "retains liability over the acts of" the Defendant SPOs because their work at the Center "implicates [its] non-delegable duties to its shelter guests." *Id.*, ¶¶ 133–135. Count Seven alleges that Apollon and, through the doctrine of *respondeat superior*, the District of Columbia, assaulted and battered Plaintiff when Apollon placed too-tight handcuffs on Plaintiff and refused to loosen or remove them. *See id.*, ¶¶ 136–139. As relevant here, Count Eight alleges that the District, through the Defendant SPOs, falsely imprisoned Plaintiff by detaining him at the Center "for approximately 25 minutes"; Plaintiff asserts the same three theories of vicarious liability as are outlined in Count Six. *See id.*, ¶¶ 140–48. As relevant here, Count Nine alleges, again relying on the same three vicarious liability theories cited in Counts Six and Eight, that the District is liable for the Defendant SPOs' intentional infliction of emotional distress upon Plaintiff when they "violently attack[ed] [him] unprovoked" at the Center. *See id.*, ¶¶ 149–156. Count Ten alleges that Apollon and, through the doctrine of *respondeat superior*, the District of Columbia, intentionally inflicted emotional distress on Plaintiff when Apollon placed Plaintiff in too-tight handcuffs and refused to loosen or remove them. *See id.*, ¶¶ 157–160. As relevant here, Count Eleven, relying on the same three vicarious liability theories cited in Counts Six, Eight, and Nine, alleges that the District is liable for the Defendant SPOs' negligent infliction of emotional distress upon Plaintiff when they "violently attack[ed]

[him] unprovoked" at the Center. *See id.*, ¶¶ 161–169. Finally, Count Twelve alleges that Apollon and, through the doctrine of *respondeat superior*, the District of Columbia, negligently inflicted emotional distress on Plaintiff when Apollon placed Plaintiff in too-tight handcuffs and refused to loosen or remove them. *See id.*, ¶¶ 170–174.

On April 10, 2023, the District and Apollon filed their motion to dismiss Plaintiff's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* ECF No. 14 at 1. The Moving Defendants argue that (1) Plaintiff has failed to adequately plead grounds to hold the District vicariously liable for the alleged actions of the Defendant SPOs, *see id.* at 6–9; *see also* ECF No. 17 at 3–7; (2) Plaintiff has not adequately alleged a constitutional violation by Apollon because his conduct was objectively reasonable under the circumstances or because Plaintiff has not pleaded that the too-tight handcuffs caused him serious injury, *see* ECF No. 14 at 9–10; *see also* ECF No.17 at 7–8; (3) Plaintiff has not adequately alleged a claim for assault and battery against Apollon or the District because Apollon's conduct was objectively reasonable in light of the circumstances, *see* ECF No. 14 at 11; *see also* ECF No. 17 at 7–8; and (4) Plaintiff has not adequately alleged that Apollon's conduct was sufficiently outrageous, that it placed Plaintiff in fear for his safety, or that it caused Plaintiff severe emotional distress and so fails to state a claim for intentional or negligent infliction of emotional distress, *see* ECF No. 14 at 11–13; *see also* ECF No. 17 at 8–9.

## II.    LEGAL STANDARDS

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of a complaint on the basis that it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A court reviewing a 12(b)(6) motion must accept as true the well-pleaded factual allegations contained in the complaint, *Atherton v. D.C. Off. of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009),

construe those allegations "in the light most favorable to the plaintiff[]," *Vick v. Brennan*, 172 F. Supp. 3d 285, 295 (D.D.C. 2016), and give the plaintiff the benefit of "reasonable inferences [that can be drawn] from those allegations," *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016). Although the plaintiff need not make "detailed factual allegations" to avoid dismissal, he or she must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 555 (2007). Rather, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). To meet this standard, the plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[4] *Id.*

---

[4] Where a government official is entitled to qualified immunity, the plaintiff cannot survive a Rule 12(b)(6) motion to dismiss. *See, e.g.*, *Goode v. District of Columbia*, 531 F. Supp. 3d 366, 382 (D.D.C. 2021) ("[W]hen a plaintiff sues a government agent in his/her individual capacity and the defenses of absolute and qualified immunity are raised, that plaintiff must overcome those defenses in order to survive a Rule 12(b)(6) motion to dismiss." (alteration in original) (quoting *Jackson v. Bush*, 448 F. Supp. 2d 198, 200 (D.D.C. 2006))); *see also, e.g.*, *Lewis v. District of Columbia*, 768 F. Supp. 3d 76, 101 (D.D.C. 2025) ("[A]lthough the case is before the Court on a motion to dismiss and, thus, without a factual record, the Supreme Court has 'identified a clear mandate for courts to resolve qualified immunity questions at the earliest possible stage of litigation.'" (quoting *Turpin v. Ray*, 319 F. Supp. 3d 191, 196 (D.D.C. 2018))). Here, it is not entirely clear whether the Moving Defendants are claiming that Apollon is entitled to qualified immunity— they never say so explicitly. Their argument on Plaintiff's Fourth Amendment excessive force claim focuses entirely on whether he has shown that Apollon violated his constitutional rights, which is one of the two steps of the qualified immunity analysis and, if they are correct that Plaintiff has not alleged such a violation, is dispositive on the issue. *See, e.g.*, *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) ("[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012))). As that is the Moving Defendants' focus, it is substantively immaterial here whether they are contending that Apollon is entitled to qualified immunity or merely that he did not violate Plaintiff's constitutional rights because the analysis on those issues is identical: "[T]he scope of qualified immunity must be evaluated using the same 'objective reasonableness' criteria with which [the Supreme Court] directs [a court] to scrutinize an officer's actions under the fourth amendment." *Richardson v. Korson*, No. 10-cv-2049, 2011 WL 13267490, at *4 (D.D.C. Aug. 26, 2011) (first alteration in original) (quoting *Wardlaw v. Pickett*, 1 F.3d 1297, 1303 (D.C. Cir. 1993)).

### III.    DISCUSSION

#### A.    The District of Columbia's Liability for the Conduct of the Defendant SPOs (Counts Six, Eight, Nine, and Eleven Against the District of Columbia)

As noted, Plaintiff advances three theories on which the District of Columbia should be found vicariously liable for the alleged torts of the Defendant SPOs: *respondeat superior*, apparent authority, and non-delegable duty. He alleges the following facts in support of those theories.

Under D.C. Code § 23-852(a), SPOs are empowered to effect warrantless arrests of individuals "for offenses committed within premises to which [their] jurisdiction extends." ECF No. 10, ¶ 70 (quoting D.C. Code § 23-852(a)). Upon an application made in the names of the prospective SPO and of the persons or corporations whose premises will be patrolled, the Mayor may appoint an SPO, provided that he or she is "paid wholly by the corporation or person on whose account the[] appointment[] [is] made." *Id.*, ¶¶ 71–73 (quoting D.C. Code § 5-129.02(a)) (citing D.C. Mun. Regs. tit. 6-A, § 1105.1). D.C. regulations require the agencies and employers that engage SPOs to supervise those SPOs in their employ. *See id.*, ¶ 74 (citing D.C. Mun. Regs. tit. 6-A, § 1106.2). Additionally, a firearms registration certificate may be issued to an organization that employs SPOs. *See id.*, ¶ 75 (citing D.C. Code § 7-2502.01). The Defendant SPOs were employed by Security Assurance Management, Inc., an entity the District contracted to provide SPOs to patrol the Center, which the District, through its agency the D.C. Department of Human Services (also known as "DHS"), operated as an overnight emergency cold shelter. *See id.*, ¶¶ 76, 82–83.

The Department of Human Services is responsible for caring for unhoused people who use its shelters. *See id.*, ¶ 77. D.C. law provides that shelter guests have the right "[a]t all times, [to] be treated by providers and [the Department of Human Services] with dignity and respect" and to "[a]ccess services . . . free from verbal, emotional, sexual, financial, and physical abuse and

exploitation." D.C. Code § 4-754.11(a)(1), (4); *see* ECF No. 10, ¶ 78. The Department of Human Services, through its Shelter Monitoring Unit, "monitor[s] shelters and services provided by the District and its contractors" to unhoused individuals. ECF No. 10, ¶ 79 (quoting D.C. Code § 4-754.51). Such monitoring "is supposed to include attention to the health, safety, and cleanliness of shelters as well as contractors' compliance with the provider standards established" by the D.C. Code. *Id.*; *see also* D.C. Code § 4-754.52(a)(6) (outlining the duties of the Shelter Monitoring Unit, which includes evaluation of shelters' "[c]ompliance with provider standards established by §§ 4-754.21 through 4-754.25 [of the D.C. Code]"). According to the D.C. Interagency Council on Homelessness' Winter Plan for the 2022 fiscal year, when the monitoring of a shelter reveals that corrective action is required, that action must be taken within a certain amount of time and its completion confirmed by the Department of Human Services. *See* ECF No. 10, ¶ 81. More, an office within the Department of Human Services investigates reports of unusual incidents by its contractors and providers. *See id.*, ¶ 80. Plaintiff further alleges that the Department of Human Services "actively directed" SPOs assigned to the Center to patrol certain locations on the property; to address "various security issues and incidents" on the premises; to investigate "incidents" and "report incidents and individuals," including those who "should be barred or expelled from the property"; and to "forcibly evict" those whom the SPOs determined should be expelled. *Id.*, ¶¶ 84–86.

Based on those facts, the undersigned addresses Plaintiff's theories of vicarious liability in turn, each of which fails.

1.    *Respondeat Superior*

Under District of Columbia law,[5] "to succeed [on] the *respondeat superior* theory of lia-

bility," Plaintiff "must show that a master-servant relationship existed" between the Defendant

SPOs and the District of Columbia, "and that the incident at issue occurred" while the Defendant

SPOs were "acting within the scope of [their] employment."[6] *Moorehead v. District of Columbia*,

747 A.2d 138, 142 (D.C. 2000) (quoting *Giles v. Shell Oil Corp.*, 487 A.2d 610, 611 (D.C. 1985)).

Here, the parties concentrate on the first issue—"[w]hether a master-servant (or principal-agent)

relationship exists." *Id.* at 143 (quoting *District of Columbia v. Hampton*, 666 A.2d 30, 38 (D.C.

1995)).  That is a fact-bound determination in which courts generally consider five factors: "(1)

the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge,

(4) the power to control the servant's conduct, [and] (5) [] whether the work is part of the regular

business of the employer." *Id.* (quoting *Hampton*, 666 A.2d at 38).  Courts often say that the fourth

factor, which is "usually" the "determinative" one, focuses on "the right to control an [alleged

tortfeasor] in the performance of a task and in its result" rather than "the actual exercise of control

---

[5] No party has argued that some other state's law governs the common law tort claims at issue and, because the tort and the alleged injuries occurred in the District of Columbia and there is no indication that any relevant party has a connection to any other forum, the parties' assumption is almost certainly correct. *See, e.g.*, *Anderson–Bey v. District of Columbia*, 466 F.Supp.2d 51, 67 (D.D.C. 2006) (noting that, in determining what law applies to tort claims, District of Columbia courts consider "the place where injury occurred; where the tortious conduct occurred; where the parties have their domiciles, residences, nationalities, or place of incorporation or business; [and] where the relationship between the parties 'is centered'" and stating that "[w]here the conduct complained of and the injury both occur in the same state, that state's law will usually control" (quoting Restatement (Second) of Conflict of Laws, § 145)); *see also Ideal Elec. Sec. Co., Inc. v. Int'l Fid. Ins. Co.*, 129 F.3d 143, 148 (D.C.Cir.1997) ("When deciding state-law claims under diversity or supplemental jurisdiction, federal courts apply the choice-of-law rules of the jurisdiction in which they sit.").

[6] As the Court of Special Appeals of Maryland has explained: "[T]he principal/agent relationship is a generic one—a genus, of which the master/servant relationship is a species.  Thus, while all masters are principals and all servants are agents, there are some principals who are not masters and some agents who are not servants." *State v. Cottman Transmissions Sys., Inc,*, 587 A.2d 1190, 1198–99 (Md. Ct. Spec. App. 1991) (alteration in original) (quoting *Sanders v. Rowan*, 484 A.2d 1023, 1028 (Md. Ct. Spec. App. 1984)).  However, the D.C. Court of Appeals uses the labels "principal-agent, master-servant, and employer-employee" interchangeably, stressing that it is not the label that matters, but "simply whether, under the doctrine of *respondeat superior*, the principal/master/employer should be held vicariously liable for the acts or omissions of the agent/servant/employee." *Judah v. Reiner*, 744 A.2d 1037, 1039 n.5 (D.C. 2000).

or supervision." *Id.* (quoting *Hampton*, 666 A.2d at 38–39). However, it is also clear that, "[i]n analyzing the . . . right to control," courts "generally look[] to the actual relationship between the parties," including "specific instances of actual control." *Hampton*, 666 A.2d at 39 (quoting *Safeway Stores, Inc. v. Kelly*, 448 A.2d 856, 861 (D.C. 1982)).

*Moorehead* is the leading case on the District's liability for the torts of SPOs. As relevant here, it involved an SPO working in a retail establishment—a Rite-Aid Pharmacy—who was notified by a customer that the plaintiff was stealing merchandise. *See Moorehead*, 747 A.2d at 141. The plaintiff eventually left the store and, with the SPO in pursuit, dropped a gym bag, which the SPO returned to the store and searched, unsuccessfully, for store property. *See id.* The plaintiff then returned to the store and asked for his bag back; in the ensuing argument and scuffle the SPO knocked him to the ground with his baton, causing injury. *See id.* The plaintiff sued the District of Columbia, alleging that it was liable for the SPO's conduct under the doctrine of *respondeat superior*. *See id.* On a motion for judgment on the pleadings, the trial judge dismissed the claims against the District based on that theory. *See id.* at 142. The D.C. Court of Appeals affirmed. *See id.* at 141. Engaging in the multi-factor analysis outlined above, the court found on the first factor that "although the District (through the Mayor) appoints special police officers, the corporation or individual for whom the appointee works must apply for the appointment. That employer 'selects and engages' the appointee 'for duty in connection with the property of, or under the charge of, such corporation or individual.'" *Id.* at 144 (alteration in original) (quoting former D.C. Code § 4-114, now D.C. Code § 5-129.02).[7] On the second factor, the court found that D.C. law requires "the corporation or person on whose account their appointments are made" to pay the SPOs. *Id.* (quoting former D.C. Code § 4-114, now D.C. Code § 5-129.02). On the third factor, the court

---

[7] Although there are differences in the wording of former D.C. Code § 4-411 and current D.C. Code § 5-129.02, no party argues that those differences are material.

found that, "although the District has the power to deny, suspend, or revoke a special police of-ficer's appointment, only the corporation or individual has the power to terminate the SPO's em-ployment at any time, presumptively with or without cause." *Id.* Plaintiff does not argue that any of those factors weigh in favor of a finding that the District has *respondeat superior* liability for the alleged torts of the Defendant SPOs; instead, he focuses on the fourth factor: the question of control. *See* ECF No. 15 at 7, 14–17.

*Moorehead* held—on that "most important[]" question—that "nothing in the statute or reg-ulations" governing SPOs "gives the District control over special police officers," even when "as-sum[ing], for the sake of argument, that the regulation of the manner in which SPOs carry out their duties is comprehensive." *Id.* at 144. The court explained that "broad regulation of an activity authorized by the District does not, by itself, demonstrate control over persons involved in that activity" because it does not give the District "the right to control the daily activities" of the regu-lated individuals. *Id.* at 144–45 (quoting *Hampton*, 666 A.2d at 40). However, the court allowed that "there may be cases in which the particular facts show that a special police officer is an agent of the District." *Id.* at 143.

Plaintiff contends that this is one of those cases. His first salvo notes that "*Moorehead* concerned an SPO working for a Rite-Aid Pharmacy, not a District-operated cold emergency shel-ter for unhoused people." ECF No. 15 at 15. That is true, but Plaintiff does not explain why or how that changes the analysis. There appears to be some attempt to flesh out the argument in his sur-reply, but it does not further his cause. He asserts that the Defendant SPOs "were working at the shelter at the District's behest, and they were doing so under a contract between [Security Assistance Management] and the District." ECF No. 22 at 5. He then claims that case law indi-cates that "a site operator (here, the District) may be held liable for the actions of a security officer

12

who is employed by a separate contractor so long as '*the evidence establishes a master-servant relationship.*'" *Id.* (emphasis added) (quoting *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 759 (D.C. 2001)). That is, even according to Plaintiff, the mere fact that the premises was a shelter run by the District does not work; what matters is whether the facts show a master-servant relationship. And so, the argument leads back to square one.

More to the point is Plaintiff's contention that, unlike the plaintiff in *Moorehead* who relied primarily on the statutes and regulations governing SPOs, Plaintiff here "has set forth specific factual allegations and circumstances . . . supporting an inference that the District had the right to control" the conduct of the Defendant SPOs. ECF No. 15 at 15. He turns first to a provision in the D.C. Code providing that DHS must monitor services provided by the District's contractors to unhoused clients, including "contractors' compliance with the provider standards established by D.C. Code §§ 4-754.21 through 4-754.25"[8]; he further alleges that such monitoring requires DHS to note any corrective actions that must be taken, to confirm that such actions have been completed, and to investigate reports of unusual incidents involving contractors. *Id.* at 15–16. Here, *Hampton* is instructive. In that case, the biological parent of a child who was killed while in foster care alleged that the District of Columbia was liable for the negligent acts of the foster parent under the doctrine of *respondeat superior*. 666 A.2d at 32. The biological parent "argue[d] that the many

---

[8] D.C. Code § 4-754.21 establishes common standards for all providers of services for the unhoused and requires, among other things, that staff is properly trained and supervised; facilities are safe, clean, and sanitary; services are provided free of discrimination based on protected characteristics; clients are assisted in preparing for living in permanent housing and informed of services for which they may be eligible; and proper procedures regarding complaints, reports of bullying, modification of policies and practices, and the like, are developed. *See* D.C. Code § 4-754.21. D.C. Code § 4-754.21a provides standards with regard to the LGBTQ population. D.C. Code § 4-745.22 outlines standards applicable to severe weather shelters, such as clean beds and linens, toilet facilities, and basic needs. D.C. Code § 4-754.23 outlines standards applicable to low barrier shelters, including hot shower facilities and personal hygiene supplies. D.C. Code § 4-754.24 outlines standards applicable to temporary shelter, transitional housing, and permanent housing programs, including properly trained case managers, referral to support services, access to storage, laundry facilities, phones, and mail. D.C. Code § 4-754.25 outlines additional standards for transitional housing.

rules and regulations concerning foster homes"—which "set[] forth minimum requirements in twenty-one areas, including such items as cleanliness of the foster home, sleeping arrangements for the foster children, heat and hot water, toilet and bath facilities, smoke detectors, medical treatment of the foster children, and the health of the foster parent"—"demonstrate[d] that the District reserved the right to control a foster parent." *Id.* at 33 n.5, 39. The court ruled that such evidence was insufficient to create a jury question as to whether the District was responsible for the conduct of the foster parent. *See id.* at 41. It recognized that those rules "implicitly g[ave] the District the right to control such matters as the sleeping arrangements for a foster child, the temperature of the foster home, the diet of the foster child, and certain aspects of the foster parents' health."[9] *Id.* at 39. They also allowed the District to "inspect a foster home at any time" and to "remove a foster child from the foster home at any time without prior notice." *Id.* at 39–40. However, although those "regulations obviously show[ed] that the District ha[d] the authority to dictate many aspects of a foster child's life in a foster home," they did not "establish that the foster parent [was] under the *actual* control of the District to a degree sufficient to make him or her the District's [servant]." *Id.* at 40. Rather, "'the right to inspect' and 'the right to set standards by which [a foster parent performs her duties] are not indicia of control,'" because they "in no way indicate that [the District] had the right to control the day-to-day operation of the [foster home] or the day-to-day performance of [the foster parent]." *Id.* (alterations in original) (quoting *Giles*, 487 A.2d at 613). The rules Plaintiff cites here similarly establish standards for DHS premises and contractors and for DHS oversight, including monitoring and inspection. But under the teaching of *Hampton* they do not show that the District "had the right to control . . . the day-to-day performance of the [Defendant SPOs]." *Id.* (quoting *Giles*, 487 A.2d at 613).

---

[9] For example, the regulations governed "such aspects of 'physical set-up' as the spacing of beds in a room, . . . lighting and ventilation, [and] screens on windows." *Hampton*, 666 A.2d at 40 n.18.

Next, Plaintiff highlights his allegation that the District of Columbia "contracted with [Security Assurance Management] to provide SPOs"—including the Defendant SPOs—"to patrol the . . . Center property." ECF No. 15 at 16 (citing ECF No. 10, ¶ 83). A contract or agreement may provide evidence of the right to control, but the mere existence of such a contract or agreement does not; rather, it is the *terms* of the contract that matter. *See, e.g.*, *United House of Prayer for All People v. D.C. Dep't of Transp.*, 285 A.3d 174, 183 (D.C. 2022) (stating that, to determine whether an entity "had the power to control" a contractor's conduct, "[w]e start with the language of the Agreement between the parties"); *Beegle v. Rest. Mgmt., Inc.*, 679 A.2d 480, 485 (D.C. 1996) ("In analyzing an employer's right to control, we look to . . . the language of any agreement between them . . ."); *Henderson v. Charles E. Smith Mgmt., Inc.*, 567 A.2d 59, 62 (D.C. 1989) (noting that the extent to which the element of control exists can be shown by the terms of the contract between the parties); *see also, e.g.*, *Cunningham v. Herbert J. Thomas Mem'l Hosp. Ass'n*, 737 S.E.2d 270, 277 (W. Va. 2012) (noting that "the mere existence of a contract" will not resolve whether the relationship is that of master and servant; rather, "particular contractual terms" pertaining to the issue of the "power of control" are relevant). Plaintiff has alleged no details of that contract and therefore has failed to show that it weighs in favor of a finding that the District controlled the conduct of the Defendant SPOs.

Finally, Plaintiff points to his allegations that DHS directed SPOs "to certain locations on the [Center] property," to "identify and investigate incidents, report incidents and individuals to DHS staff, . . . report which individuals should be barred or expelled," and "to forcibly evict, if necessary, any individual the SPOs determined to be unwanted, a security threat, or otherwise unauthorized to be on the premises." ECF No. 10, ¶¶ 84–86; *see also* ECF No. 15 at 16. But, again, the question is not whether the District "has the authority to dictate many aspects of" the

Defendant SPOs' performance; it is whether "the District had the right to exercise control over the day-to-day" performance of their duties. *Hampton*, 666 A.2d at 38, 40. The allegations do not establish that level of control. First, the bulk of those allegations merely assert that DHS instructed the Defendant SPOs to perform the general duties of Special Police Officers or other security personnel—identifying, investigating, and reporting incidents, and evicting those who should not be on the premises. Directing individuals generally to perform the job for which they were hired does not indicate control over the day-to-day performance of their duties. There are no allegations here that, for example, that DHS personnel on a day-to-day basis "identified specific problems and directed the [SPOs] to those problems." *Giles*, 487 A.2d at 612.

Indeed, the operative complaint indicates that the Defendant SPOs had significant amounts of discretion—especially as to the conduct at issue here. The alleged torts committed by the Defendant SPOs occurred while Plaintiff was being evicted from the Center. And yet, Plaintiff's allegations confirm that the SPOs at the Center could "forcibly evict, *if necessary*, any individual *the SPOs determined* to be unwanted, a security threat, or otherwise unauthorized to be on the premises." ECF No. 10, ¶ 86 (emphasis added). That is, according to Plaintiff's own allegations, SPOs had the discretion to determine whether a client was "unwanted, a security threat, or otherwise unauthorized to be on the premises" and, if so, whether it was "necessary" to evict that person. *Id.*

That is important because a person may act as a servant "in some matters but not in others." *Henderson*, 567 A.2d at 65 (quoting *In re Shulman Transp. Enters., Inc.*, 744 F.2d 293, 295 (2d Cir. 1984)). And "vicarious liability for an agent's physical torts arises only if the principal has the right to control the agent's *specific injury-causing conduct* in particular." *Eads v. Borman*, 277 P.3d 503, 509 (Or. 2012) (emphasis in original). For example, in *Henderson*, a company that

owned an apartment complex contracted with a management company, known as CES, and "vested [it] with authority over some matters concerning personnel, leasing, and management"—including some aspects of maintenance—of the complex. 567 A.2d at 61. Two maintenance workers, employed by the apartment complex owner, were injured in a boiler accident and sued CES. *See id.* at 60. The question was whether CES was an agent for the apartment owner, because, if it was, "it was immune from suit" under D.C. worker's compensation laws. *Id.* The D.C. Court of Appeals noted that "the actual dealings" between the two companies demonstrated that CES "acted as an agent" for the apartment complex owner "in some matters, such as leasing and finance"; however, the crucial question was whether the owner "had the right to exercise control over CES and its employees in decisions regarding the repair and maintenance of the boiler, and thus whether, with respect to the accident" at issue, CES was an agent of the owner. *Id.* at 65. Here, then, the question is whether the District, through DHS, exercised day-to-day control over the Defendant SPOs with regard to the eviction of clients from the Center, which is the context in which Plaintiff alleges he was assaulted and battered, falsely imprisoned, and caused emotional distress. Plaintiff has made no allegations that would allow a reasonable fact-finder to determine that DHS exercised sufficient control in such matters; rather, his allegations suggest the contrary.

Accordingly, the undersigned recommends finding that Plaintiff has failed to plead facts sufficient to show that the District has *respondeat superior* liability for the alleged torts of the Defendant SPOs.

### 2.  Apparent Agency

The parties' arguments as to "apparent agency" or "apparent authority"[10] focus on a single case—*Search v. Uber Technologies, Inc.* There, the plaintiff, who had used the Uber app—both in

---

[10] Some courts have distinguished the two concepts. The Supreme Court of Connecticut, for example, explains that "the doctrine of apparent authority expands the authority of an actual agent, while the doctrine of apparent agency

the past and on the evening of his injury— to order transportation, sued the company asserting that

it was "liable for an alleged knife attack by one of its drivers" under both "*respondeat superior*

and apparent-agency theories." *Search*, 128 F. Supp. 3d 222, 226–27 (D.D.C. 2015). The *Search*

court explained that apparent agency (or apparent authority) provides "a basis for imputing liability

for the tortious acts of independent contractors to those who hired them 'when the principal places

the agent in such a position as to mislead third persons into believing that the agent is clothed with

the authority which in fact he does not possess.'" *Id.* at 234–35 (quoting *Makins v. District of*

*Columbia*, 861 A.2d 590, 594 (D.C. 2004)); *see also* ECF No. 15 at 18; ECF No. 17 at 5–6. Further:

> Apparent authority "depends upon the third-party's perception of the agent's authority," which "may be based upon written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on her behalf" by the apparent agent.

*Search*, 128 F. Supp. 3d at 235 (quoting *Makins*, 861 A.2d at 594). That is, under D.C. law, "[a]

third party seeking to hold a principal on the apparent authority of the agent must show acts or

statements of the principal known to the third party and on which the third party reasonably relied

to his detriment." *Wagshal v. Selig*, 403 A.2d 338, 344 (D.C. 1979) (alteration in original) (quoting

*Tel-Ads, Inc. v. Trans-Lux Playhouse, Inc.*, 232 F. Supp. 198, 201 (D.D.C. 1964)).

In his opposition to the Motion to Dismiss, Plaintiff alleges that the District "represented

to the public that all shelter contractors, including SPOs, are subject to 'rigorous screening

---

creates an agency relationship that would not otherwise exist." *Cefaratti v. Aranow*, 141 A.3d 752, 760 (Conn. 2016). The Colorado Court of Appeals has indicated that apparent agency applies to tort claims, while apparent authority applies to contract claims. *Daly v. Aspen Ctr. for Women's Health, Inc.*, 134 P.3d 450, 454 (Colo. Ct. App. 2005). However, many courts use the terms interchangeably. *See, e.g.*, *id.* ("Although apparent agency is theoretically distinct from apparent authority, the terms are often used interchangeably"); Restatement (Third) of Agency § 2.03 cmt. b. The D.C. Court of Appeals has asserted that "[a]n agency relationship . . . may be created through actual authority (either express or implied), *apparent authority*, or ratification," *FDS Rest., Inc. v. All Plumbing Inc.*, 241 A.3d 222, 237 (D.C. 2020) (emphasis added), suggesting that it sees no distinction.

procedures' and that it 'continues to monitor' shelter SPOs after they are hired," citing D.C. Code provisions or municipal regulations setting out screening procedures and training requirements for SPOs, articulating standards for shelter providers, and tasking DHS with monitoring shelters. ECF No. 15 at 18 (quoting *Search*, 128 F. Supp. 3d at 235–36). His sur-reply makes similar assertions. *See* ECF No. 22 at 8 (stating that Plaintiff pleaded "detailed factual allegations" that "the District represents to the public that shelter guests have the right to be treated with respect and to be free from abusive treatment or violence and that the District screens, monitors, audits, and takes corrective action against its contractors to ensure the effectuation of these very rights" and citing paragraphs from the operative complaint discussing D.C. Code provisions, the District's 2022 Winter Plan, and pages on the DHS website allowing individuals to report incidents at homeless shelters). But, as noted, "[a] third party seeking to hold a principal on the apparent authority of the agent *must show acts or statements of the principal known to the third party and on which the third party reasonably relied* to his detriment." *Wagshal*, 403 A.2d at 344–45 (alteration in original) (emphasis added) (quoting *Tel-Ads*, 232 F. Supp. at 201). That requirement is borne out in the Restatement of Agency, which D.C. courts have applied "in resolving issues of apparent authority." *A-J Marine, Inc. v. Corfu Contractors, Inc.*, 660 F. Supp. 2d 84, 88–89, 89 n.8 (D.D.C. 2009). "Apparent authority . . . is created by a person's manifestation that another has authority to act with legal consequences for the person who makes the manifestation, when a third party reasonably believes the actor to be authorized and the belief is traceable to the manifestation." Restatement (Third) of Agency § 3.03 (Am. Law Inst. 2006). "The relevant state of mind is that of the person who observes or otherwise learns of the manifestation." *Id.* § 1.03 cmt. b. "Apparent authority is present only when a third party's belief is traceable to manifestations of the principal." *Id.* § 3.03 cmt. b; *see also id.* § 2.03 ("Apparent authority is the power held by an agent or other

actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations."). Plaintiff's problem is that he has alleged only that the materials he cites were publicly available; he has not shown that he was aware of those statutes, regulations, or procedures at the time in question, let alone that he relied on them when accessing the Center.

Plaintiff asserts that "the *Search* court looked at the specific representations that Uber made to the public about its relationship to its drivers to determine whether 'apparent agency' was at play." ECF No. 22 at 7. That is true, as far as it goes. The court there noted that the plaintiff "allege[d] that Uber, '[t]hrough several forms of media' such as its mobile app and its website, represented to customers that it is 'your private driver,' 'that it subjects its drivers to rigorous screening procedures' before hiring them, and that it 'continues to monitor' those drivers after they are hired." *Search*, 128 F. Supp. 3d at 235 (alteration in original) (quoting the amended complaint). But in *Search*, the plaintiff's reliance was not in question: the operative complaint alleged that the plaintiff had repeatedly used the Uber app on his phone to order transportation and that, on the evening in question, he "rel[ied] upon Uber's prior representations that Uber would provide safe and reliable transportation and safe and reliable drivers" when he decided to use the service. Am. Compl., ¶¶ 16–17, *Search v. Uber Techs., Inc.*, 128 F. Supp. 3d 222 (D.D.C. 2015) (No. 15-cv-257), ECF No. 6. Plaintiff here makes no such averment.[11]

---

[11] Nor does Plaintiff argue that it is reasonable to infer his knowledge and reliance from the facts alleged. *See, e.g.*, *Rossmann v. U.S. State Dep't Passport Div.*, No. 20-cv-503, 2021 WL 1178001, at *2 (D.D.C. Mar. 29, 2021) (noting that when ruling on a motion to dismiss for failure to state a claim, a court "must give the plaintiff the 'benefit of all inferences that can be derived from the facts alleged'" (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994))). Although Plaintiff does assert that he "has spent the last few years living in various D.C. shelters," ECF No. 10, ¶ 2, that is too thin a reed to support the inferences that (1) he knew the contents of D.C. Code §§ 4-754.11, 4-754.21–4.754.25, and 4-754.51, as well as the provisions of District's 2022 Winter Plan and that DHS is required to investigate reports of unusual incidents at shelters, which are the materials Plaintiff points to in supporting his theory of apparent agency, *see* ECF No. 22 at 6–9 (citing ECF No. 10, ¶¶ 78–81); (2) if he did know of those materials, he believed that they meant that SPOs were agents of the District of Columbia; and (3) if he did have that knowledge and that belief, that he relied on them in choosing to access the Center on the night of the incident.

Plaintiff's allegations, even if proven, are insufficient to show that the District is vicariously liable for the alleged tortious conduct of the Defendant SPOs under a theory of apparent agency. *See, e.g.*, *Andrews v. Wash. Metro. Transit Auth.*, 819 F. Supp. 2d 7, 12 (D.D.C. 2011) (dismissing the plaintiffs' claim based on apparent authority where their "complaint [did] not allege [its] basic elements," such as that they reasonably relied to their detriment on the conduct of the principal).

### 3. Non-Delegable Duty

According to the Restatement (Third) of Agency, "[a] principal required by contract or otherwise by law to protect another cannot avoid liability by delegating performance of the duty, whether or not the delegate is an agent." Restatement (Third) of Agency § 7.06 (Am. Law. Inst. 2006). The devil is in the details, however, and, as one court has noted, "[t]here are no clearly defined criteria for identifying duties that are nondelegable." *Bennett v. State Farm Fire & Cas. Co.*, 156 N.Y.S.3d 92, 96 (N.Y. App. Div. 2021).

Plaintiff offers a source for the alleged non-delegable duty: D.C. Code § 4-754.11, which provides that "[c]lients served in the Continuum of Care shall have the right" to "be treated by providers and [DHS] with dignity and respect"; "[a]ccess services . . . free from verbal, emotional, sexual, financial, and physical abuse and exploitation"; and "[s]helter in severe weather conditions." D.C. Code § 4-754.11(a)(1), (4). He cites no case finding that statute or a similar statute creates a non-delegable duty; instead, he quotes a Supreme Court case explaining "[t]he concept" of a non-delegable duty, which is to "answer for the well-being of those persons to whom the duty runs"; that is, a non-delegable duty is "an affirmative obligation to ensure the protection of the person to whom the duty runs." *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375,

395–96 (1982).  But that is little help.  As the Supreme Court explained—in the very next paragraph of *General Building Contractors*:

> [T]o characterize such a duty as "nondelegable" is merely to restate the duty. Thus, . . . the question is not whether . . . employers and associations are free to delegate their duties to abide by [a statute], for whatever duty the statute imposes, they are bound to adhere to it.  The question is *what* duty does [the statute] impose.

*Id.* at 396 (emphasis in original).  Plaintiff's brief provides no clue.

It is not worth belaboring this point because, as should be clear, Plaintiff's bare bones submissions on this issue have failed to allege facts or mount argument that makes plausible his hypothesis that a non-delegable duty exists here.  Instead, the undersigned will note two cases that undermine Plaintiff's unsupported position, one from the U.S. Supreme Court and the other from the D.C. Court of Appeals.  First, *General Building Contractors*, the only case upon which Plaintiff relies.  Plaintiff grounds his theory in the fact that D.C. Code § 4-754.11 speaks of "rights"—specifically, "shelter guests' right to shelter, right to be treated with dignity and respect, and right to access services free from physical abuse."  ECF No. 15 at 19.  In *General Building Contractors*, the Supreme Court addressed, among other things, the question of vicarious liability under 42 U.S.C. § 1981.  That statute provides:

> All persons within the jurisdiction of the United States shall have *the same right* in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981 (emphasis added).  But the fact that the statute guaranteed rights to a certain population was not dispositive.  Instead, the Supreme Court asked whether the section "impose[s] a duty to refrain from intentionally denying blacks the right to contract on the same basis as whites or . . . impose[s] an affirmative obligation to ensure that blacks enjoy such a right."  *Gen. Bldg.*

*Contractors*, 458 U.S. at 396. It found no such "affirmative obligation," noting that the "language of the statute does not speak in terms of duties" but merely "declares specific rights." *Id.* That language did not suggest that Congress "intend[ed] to make [employers and associations] the guarantors" of the rights of others "as against third parties who would infringe them." *Id.*

Second, the D.C. Court of Appeals decision. In *Herbert v. District of Columbia*, a question was "whether the District of Columbia [was] vicariously liable under the 'non-delegable duty' doctrine to a prisoner at the District of Columbia jail for injuries resulting from medical malpractice on the part of an employee of an independent contractor." 716 A.2d 196, 197 (D.C. 1998) (en banc). The injured party claimed that a D.C. Code provision that imposed on the District of Columbia Department of Corrections the "responsibility for 'the safekeeping, care, protection, instruction, and discipline of all persons committed to [its] institutions'" created a non-delegable duty for the District to ensure the protection of inmates in D.C. jails. *Id.* at 197–98 (quoting former D.C. Code § 24–442 (1996)). The en banc court disagreed. It determined that the statute "encompasse[d] the common law rule, which requires [only that] prison authorities and employees [] exercise reasonable care in carrying out [their] obligations." *Id.* at 198. Thus, the statute imposed upon the District the responsibility only to "exercise[] reasonable care in the selection and supervision of its independent contractors." *Id.* at 201. The court concluded by observing that "[i]f liability without fault should be imposed on the taxpayers in circumstances of the kind presented by this record, this should be effected by the legislature, not by the courts." *Id.*

Clearly, these two cases are not an all fours with the situation alleged here. Nevertheless, they weaken Plaintiff's already anemic argument, which appears to posit—without support from caselaw—that any statute that, for example, legislates a group's "right" to be free from some harm while accessing a government service imposes a non-delegable duty on the government to ensure

that group's safety.  On the contrary, to impose such a duty, a statute must do more than merely enumerate rights or assign responsibility for protecting those rights.  There must be some indication that the legislature intended to make the government the guarantor of those rights even in the absence of fault.  And without such an indication, a court should not impose "by judicial pronouncement" such an obligation.  *Id.* at 199.

*    *    *    *    *

To sum up, Plaintiff has not sufficiently pleaded that the District of Columbia should be held vicariously liable for the alleged torts of the Defendant SPOs.  The undersigned therefore recommends dismissing Counts Six, Eight, Nine, and Eleven to the extent they are alleged against the District of Columbia.

## B.    Excessive Force Against Apollon (Count Five) and Assault and Battery Against Apollon and the District of Columbia (Counts Seven)

In Count Five, Plaintiff alleges that Officer Apollon engaged in excessive force when he replaced the handcuffs the Defendant SPOs had applied with new cuffs that were too tight and refused to loosen or remove them in response to Plaintiff's complaints, causing injury.  *See* ECF No. 10, ¶¶ 40–42, 52–56, 119, 124.  Count Seven alleges that Apollon engaged in common law assault and battery based on the same allegations.  *See id.*, ¶¶ 136–139.  The analyses of the constitutional tort and the common law tort are materially identical.  *See, e.g., Young v. District of Columbia*, 107 F. Supp. 3d 69, 81–82 (D.D.C. 2015) ("The D.C. Court of Appeals has explained that to prove an assault and battery claim in a case involving allegations of excessive force by police officers, 'the inquiry is whether the officer's conduct was reasonably necessary and thereby privileged.'  Essentially the same inquiry into the reasonableness of the police officer's actions is required for an excessive force claim." (internal citation omitted) (quoting *Smith v. District of Columbia,* 882 A.2d 778, 787–88 (D.C. 2005))); *Hall v. District of Columbia*, 73 F. Supp. 3d 116,

24

121 (D.D.C. 2014) ("[A] claim for assault and battery may be established if excessive force was used to maintain the arrest." (alteration in original) (quoting *Jackson v. District of Columbia*, 412 A.2d 948, 955 (D.C. 1980))); *District of Columbia v. Tinker*, 691 A.2d 57, 64 (D.C. 1997) ("[O]ur cases make clear that 'excessive force' is a term of art denoting an act of assault or battery by law enforcement officials committed in the course of their duties.").

When deciding whether law enforcement used excessive force, courts look to whether the officer's conduct is "'objectively reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989); *see also Katz v. District of Columbia*, 285 A.3d 1289, 1312 (D.C. 2022). Law enforcement may use (or threaten to use), "some degree of physical coercion," when effecting an arrest. *Wasserman v. Rodacker*, 557 F.3d 635, 641 (D.C. Cir. 2009). "Accordingly, '[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment." *Wardlaw v. Pickett*, 1 F.3d 1297, 1303 (D.C. Cir. 1993) (alterations in original) (quoting *Graham*, 490 U.S. at 396). "In determining whether an officer's use of force was reasonable, courts consider the severity of the crime at issue, whether the plaintiff was actively resisting or attempting to evade arrest, and whether the plaintiff posed an immediate threat to the officer's or others' safety." *Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 22 (D.D.C. 2011). To succeed on a Fourth Amendment excessive force claim, the moving party must establish that "the excessiveness of the force [was] so apparent that no reasonable officer could have believed in the lawfulness of his actions." *Turpin v. Ray*, 613 F. Supp. 3d 186, 201 (D.D.C. 2020) (quoting *Wardlaw v. Pickett*, 1 F.3d 1297, 1303 (D.C. Cir. 1993)).

In 2011, the *Dormu* court found that "[a]lmost every Court of Appeals has held that overly tight handcuffing can constitute excessive force, where the handcuffing has resulted in injury or

where an individual complains about the overly-tight cuffing." 795 F. Supp. 2d at 23–24 (citing

cases from the First, Second, Third, Fifth, Sixth, Seventh, Eighth, and Ninth Circuits); *see also,*

*e.g.*, *Cugini v. City of New York*, 941 F.3d 604, 615–16, 616 n.8 (2d Cir. 2019) (noting a "consen-

sus" among the circuits "that unduly tight handcuffing can constitute excessive force in violation

of the Fourth Amendment" and collecting cases from the First, Third, Fifth, Sixth, Seventh, Eighth,

Nonth, and Tenth Circuits). The Tenth and Eleventh Circuit and the D.C. Court of Appeals have

since found similarly. *See Brooks v. Miller*, 78 F.4th 1267, 1283 (11th Cir. 2023) (holding, where

the arrestee posed no threat to law enforcement or anyone else, "it was objectively unreasonable

for [law enforcement] to unnecessarily overtighten [the arrestee's] handcuffs as part of this same

arrest and refuse to make any adjustments when [he] complained of numbness and 'excruciating

pain.'" (emphasis omitted)); *Fisher v. City of Las Cruces*, 584 F.3d 888, 894 (10th Cir. 2009) ("In

*Cortez* we explained that in a handcuffing case 'to recover on an excessive force claim, a plaintiff

must show: (1) that the officers used greater force than would have been reasonably necessary to

effect a lawful seizure, and (2) some actual injury caused by the unreasonable seizure that is not

de minimis, be it physical or emotional.'" (quoting *Cortez v. McCauley*, 478 F.3d 1108, 1129 n.

25 (10th Cir. 2007))); *Katz*, 285 A.3d at1314 ("[A] jury could find on the facts put forth . . . that

maintaining particularly tight handcuffs for even a relatively short period of time was unreasona-

ble . . ."). The Fourth Circuit has recognized, citing cases from the Sixth Circuit, that "handcuffing

an individual's wrists too tightly may be grounds for an excessive force claim." *Schoonover v.*

*Clay Cnty. Sheriff's Dep't*, No. 20-1680, 2023 WL 4026091, at *4 n.6 (4th Cir. June 15, 2023).

And the D.C. Circuit has reversed the dismissal on the pleadings of an excessive force claim that

included allegations that law enforcement fastened handcuffs too tightly around an individual's

wrists and ignored her complaints of pain.  *See Hall v. District of Columbia*, 867 F.3d 138, 157–

58 (D.C. Cir. 2017).

The question is whether Plaintiff has sufficiently alleged that Apollon's handcuffing was

objectively unreasonable under the circumstances.  A number of courts have "articulat[ed] a three-

part test for ascertaining whether unduly tight handcuffing constitutes excessive force: (1) the ar-

restee complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3)

the arrestee experienced some physical injury resulting from the handcuffing."  *Ulysse v. Stokes*,

No. 19-cv-1465, 2021 WL 4476768, at *8 (D.D.C. Sept. 30, 2021) (citing *Hughey v. Easlick*, 3

F.4th 283, 289 (6th Cir. 2021)); *see also, e.g.*, *Hewitt v. Bennett*, No. 19-cv-1927, 2020 WL

3420756, at *4 (D.S.C. June 22, 2020) ("[W]hen 'evaluating an excessive force claim based solely

on tight handcuffing' a court may consider 'whether (1) the handcuffs were unreasonably tight;

(2) the defendants ignored the plaintiff's pleas that the handcuffs were too tight; and (3) the degree

of injury to the wrists.'" (quoting *Parson v. Miles*, No. 17-cv-708, 2020 WL 58287, at *5 (D.S.C.

Jan. 6, 2020))); *Johnson v. City of New York*, No. 18-cv-5623, 2020 WL 3100197, at *3 (S.D.N.Y.

June 11, 2020) ("In evaluating the reasonableness of handcuffing, a [c]ourt is to consider evidence

that: 1) the handcuffs were unreasonably tight; 2) the defendants ignored the plaintiff's pleas that

the handcuffs were too tight; and 3) the degree of injury to the wrists." (alteration in original)

(quoting *White v. City of New York*, No. 17-cv-2404, 2019 WL 1428438, at *10 (S.D.N.Y. Mar.

29, 2019))).  The Sixth Circuit has explained that, "[c]onceptually, the handcuffing test is a subset

of the general Fourth Amendment excessive-force framework."  *Hughey*, 3 F.4th at 289.  However,

the court in *Dormu*, although it paid attention to each of those three handcuffing issues, engaged

in the traditional excessive force analysis, "consider[ing] the severity of the crime at issue, whether

the plaintiff was actively resisting or attempting to evade arrest, and whether the plaintiff posed an

immediate threat to the officer's or others' safety."  795 F. Supp. 2d at 23.  And neither the D.C.

Circuit in *Hall* nor the D.C. Court of Appeals in *Katz*—although both attended to whether the

arrestee complained the handcuffs were too tight and whether the arrestee was injured—indicated

that anything other than the traditional test should apply in a handcuffing case.  *See Hall*, 867 F.3d

at 156–58; *Katz*, 285 A.3d at 1312–14.  Accordingly, the undersigned will use the three-part "hand-

cuffing test" as a guide in applying the conventional excessive force analysis.

Plaintiff's allegations against Officer Apollon should survive the Motion to Dismiss.  Here,

Plaintiff has alleged that he was arrested for assaulting a police officer.  That charge—although

merely a misdemeanor where, as apparently here, there is no allegation that the assault caused

significant bodily injury to law enforcement, *see* D.C. Code § 22-405—is a more serious charge

than those involved in some similar cases where claims of excessive force have been permitted.

*See, e.g.*, *Brooks*, 78 F.4th at 1283 (driving without a license); *Taylor v. Guida*, No. 17-cv-123,

2019 WL 4750366, at *1 (D.D.C. Sept. 30, 2019) (fare evasion).  However, courts have allowed

claims of excessive force from too-tight handcuffs to survive where the plaintiff was arrested for

crimes like domestic assault, *see Ouza v. City of Dearborn Heights*, 969 F.3d 265, 273, 278–79

(6th Cir. 2020); robbery, *see Alexander v. Cnty. of L.A.*, 64 F.3d 1315, 1317–18, 1322–23 (9th Cir.

1995); resisting arrest, *see Geba v. Norris*, No. 14-cv-612, 2016 WL 8730898, at *2, *6–7 (E.D.

Va. Apr. 4, 2016); and misdemeanor gun possession, *see Howard v. Ealing*, 876 F. Supp. 2d 1056,

1065, 1069–72 (N.D. Ind. 2012); *cf. Williams v. District of Columbia*, 268 F. Supp. 3d 178, 190

(D.D.C. 2017) ("As to the severity of the crime, the Officers reasonably believed that [the plaintiff]

had committed simple assault, which is only a misdemeanor.").  More to the point, there is no

indication on the present record that Plaintiff "was actively resisting or attempting to evade arrest"

or that he "posed an immediate threat to the officer's or others' safety."  *Dormu*, 795 F. Supp. 2d

at 22.  According to Plaintiff, he was already subdued when Apollon arrived at the scene and at no time posed a threat to law enforcement or others.  *See* ECF No. 15 at 21 (citing ECF No. 10, ¶¶ 40–42); *see also, e.g.*, *Geba*, 2016 WL 8730898, at *6 (allowing an excessive force claim based on too-tight handcuffs to proceed because, although the plaintiff had been arrested for resisting arrest, "any potential threat [the] plaintiff posed to officer safety dissipated once the officers secured her in handcuffs" and there was no indication that she "tried to resist arrest after she was handcuffed"); *cf. Williams*, 268 F. Supp. 3d at 190–91 (finding that a jury could determine that the conduct of law enforcement constituted excessive force where they continued to exert force when the plaintiff "was effectively subdued, pinned to the ground in a prone position for over half a minute and attempting to cooperate with the Officers' attempts to handcuff him").  More, it is undisputed at this stage of the proceedings that Plaintiff complained to Apollon that the handcuffs had been fastened too tightly around his wrists.  *See* ECF No. 10, ¶¶ 3, 41, 119, 137.  These facts, if proved, "would allow a [reasonable] juror to conclude that no reasonable officer could have believed in the necessity of maintaining the tightness of [the plaintiff's] handcuffs."  *Taylor*, 2019 WL 4750366, at *4 (quoting *Dormu*, 795 F. Supp. 2d at 23).

Importantly, the Moving Defendants mount no argument that the force applied was reasonable under the circumstances based on the fact that Apollon arrested Plaintiff on suspicion of assaulting a police officer.  Indeed, their treatment of this issue in their opening brief is half-hearted, at best.  The actual argument consists of a single two-sentence paragraph that cites three cases but fails to discuss them:

> The conduct alleged here does not rise to the level required to find that the use of "too-tight" handcuffs constituted excessive force in violation of the Constitution. *See, e.g., Rodriguez v. Farrell*, 294 F.3d 1276, 1277-79 (11th Cir. 2002) (officer's refusal to adjust handcuffs on complaining suspect not excessive use of force); *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001) (handcuffing too tightly without more is not excessive force); *Robinson v. District of Columbia*, No. 03-

> 1455, 03-1456, 2006 WL 2714913, at *4-5 (D.D.C. Sept. 22, 2006) (granting qual-
> ified immunity to arresting officer who, among other things, allegedly applied
> handcuffs too tightly).  [Count] V against Officer Apollon should be dismissed.

ECF No. 14 at 10 (footnote omitted).  In any case, none of those three cases addresses "the severity of the crime at issue, whether the plaintiff was actively resisting or attempting to evade arrest, and whether the plaintiff posed an immediate threat to the officer's or others' safety."  *Dormu*, 795 F. Supp. 2d at 22.  Rather, *Rodriguez* held that the law enforcement officer who handcuffed the ar-restee was entitled to discount the arrestee's claim that his arm was injured where there was no outward manifestation of such an injury and the arrestee did not ask for the handcuffs to be ad-justed. 294 F.3d at 1278–79.  *Glenn* found that law enforcement was entitled to qualified immunity on a claim that the arrestee was handcuffed too tightly where the only harm alleged was "a de minimis injury."  242 F.3d at 314.  Similarly, *Robinson* found that law enforcement was entitled to qualified immunity where "[t]he handcuffs were put on tightly enough to cause swelling and abrasions, but plaintiff suffered no ongoing or permanent injury."  2006 WL 2714913, at *4–5. Those cases do, however, gesture toward the meat of the Moving Defendants' argument, which is relegated in their opening brief to a footnote but developed somewhat more fully in their reply: that Plaintiff has not alleged "a physical injury specifically caused by the handcuffs, as opposed to the alleged assault by the SPOs."  ECF No. 14 at 10 n.3; *see also* ECF No. 17 at 7–8.

Courts differ as to the quantum of injury a plaintiff alleging an overly-tight handcuffing claim must plead and prove.  The Sixth Circuit has held that "satisfying the 'injury' prong is not demanding" and can be satisfied by "allegations of 'pain' due to handcuffing" or of "bruising and wrist marks."  *Hughey*, 3 F.4th at 290 (first quoting *Courtright v. City of Battle Creek*, 839 F.3d 513, 519 (6th Cir. 2016); and then quoting *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 403 (6th Cir. 2009)).  In the Second Circuit, the "injury must transcend 'temporary discomfort,'

though it need not be 'severe or permanent.'" *Usavage v. Port Auth. of N.Y. & N.J.*, 932 F. Supp. 2d 575, 596 (S.D.N.Y. 2013) (citations omitted) (first quoting *Lynch ex rel. Lynch v. City of Mt. Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008); and then quoting *Vogeler v. Colbath*, No. 04 Civ. 6071, 2005 WL 2482549, at *9 (S.D.N.Y. Oct. 6, 2005)).  Here, Plaintiff alleges that he suffered numbness in his hands, swelling in his wrists and a forearm, wrist pain that lasted for months after the incident and continues to this day when he places pressure on his wrists.  *See* ECF No. 10, ¶¶ 53–54, 56, 59–60.  He also alleges he had to wear a wrist brace for weeks after the incident.  *See id.*, ¶ 55.  Those injuries, which are alleged to be "ongoing," if not "permanent," appear to satisfy the injury requirement under either standard.[12]  *Robinson*, 2006 WL 2714913, at *4; *see also Usavage*, 932 F. Supp. 2d at 596 (finding that allegations of "sharp pain, followed by numbness, discoloration, and swelling, on the night in question" and continued wrist pain and bouts of numbness "demonstrate[d] the requisite injury"); *Katz*, 285 A.3d at 1313 (holding that allegations that law enforcement handcuffed the plaintiff "with a level of force that left [him] in pain for days and prompted him to complain to officers" supported the plaintiff's claim that the officers used an unreasonable amount of force in effecting his arrest).

Perhaps recognizing that, the Moving Defendants concentrate not on the severity of Plaintiff's alleged injuries, but on their cause.  They contend that Plaintiff has not alleged that his wrist injuries were caused by the handcuffing rather than by the Defendant SPOs in the affray prior to Apollon's arrival.  *See* ECF No. 17 at 7–8; *see also* ECF No. 14 at 10 n.3.  Specifically, they note that Plaintiff alleges that "his wrists were hurt by the SPOs *before* Officer Apollon arrived at the

---

[12] The undersigned notes that *Dormu* states—in the disjunctive—that there is a consensus "that overly tight handcuffing can constitute excessive force, where the handcuffing has resulted in injury *or* where an individual complains about the overly-tight cuffing."  795 F. Supp. 2d at 23 (emphasis added).  And the court in *Taylor* denied the defendants' motion for summary judgment on the plaintiff's excessive force and assault and battery claims based on too-tight handcuffing without mentioning the severity of the plaintiff's injuries.  *See* 2019 WL 4750366, at *1–2, *3–4.  However, because no party has argued that merely complaining about tight handcuffs is sufficient in the absence of injury, the undersigned does not address that issue.

shelter" and that "when Officer Apollon later applied handcuffs too tightly, this caused him 'additional pain,' not injury." ECF No. 17 at 8 (emphasis in original). This argument should be rejected.

When ruling on a motion to dismiss for failure to state a claim, a court "must give the plaintiff the 'benefit of all inferences that can be derived from the facts alleged.'" *Rossmann*, 2021 WL 1178001, at *2 (quoting *Kowal*, 16 F.3d at 1276). First, the notion that Plaintiff has pleaded himself out of an excessive force claim by alleging that the handcuffing caused "pain" rather than "injury" should be dismissed out of hand. Pain and injury are not mutually exclusive: that pain is a primary symptom of injury is mere common sense. More, the fact that Plaintiff had wrist injuries prior to being handcuffed does not preclude the possibility that any such injuries were exacerbated by Apollon's conduct. Second, the operative complaint here sufficiently links the handcuffing to Plaintiff's alleged injuries. It alleges that, "[a]s a result of the abuse inflicted by the [Defendant SPOs] *and Defendant Apollon*, [Plaintiff] suffers ongoing harm" and proceeds to describe that harm, as described above. ECF No. 10, ¶¶ 47, 52–56, 59, 61 (emphasis added). Those allegations are repeated in the sections of the complaint setting out Plaintiff's claim of excessive force against Apollon. *See id.*, ¶¶ 119, 123–124. It may be that Plaintiff has difficulty at a later stage in these proceedings proving that Apollon caused or exacerbated Plaintiff's alleged wrist injuries. However, because the Court must credit Plaintiff's allegations on a Rule 12(b)(6) motion and afford him the benefit of all reasonable inferences to be derived therefrom, dismissal would be premature at this juncture.

Accordingly, the undersigned recommends denying the Moving Defendants' Motion to Dismiss as to Counts Five and Seven because Plaintiff has sufficiently alleged a claim for excessive force and a claim for assault and battery against Apollon. *See, e.g.*, *Young v. District of Columbia*, 107 F. Supp. 3d 69, 81–82 (D.D.C. 2015) ("Essentially the same inquiry into the

reasonableness of the police officer's actions is required for an excessive force claim [and for an assault and battery claim].").[13]

### C.    Intentional or Negligent Infliction of Emotional Distress Against Apollon and the District of Columbia (Counts Ten and Twelve)

Plaintiff pleads these counts in the alternative. *See* ECF No. 10, ¶ 171. Both are based on allegations that Apollon "handcuff[ed] [Plaintiff] too tightly, refus[ed] to loosen or remove them at [Plaintiff's] request, and laugh[ed] at [Plaintiff] while he was in pain and bleeding," which "caused [Plaintiff] to fear for his safety" and suffer emotional distress, including fear and anxiety when he sees MPS officers and humiliation traceable to the incident.[14]  *Id.*, ¶¶ 158–159; *see also*

---

[13] That determination also supports a finding that Apollon is not entitled to qualified immunity at this juncture—if indeed, the Moving Defendants intended to assert that he enjoys such protection. *See* note 4, *supra*. As noted, "officers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *Wesby*, 583 U.S. at 62–63 (quoting *Reichle*, 566 U.S. at 664). Here, the undersigned has found that the operative complaint sufficiently alleges that Apollon violated Plaintiff's constitutional right to be free from excessive force when he handcuffed Plaintiff too tightly and failed to loosen or remove the handcuffs after Plaintiff complained. The Moving Defendants have not addressed whether such a right was clearly established in March 2022, when the incident occurred. However, *Dormu* found such a right clearly established in 2011 based on the "overwhelming" consensus in the federal Courts of Appeals. 795 F. Supp. 2d at 23–24 (collecting cases from between 1998 and 2009). Consequently, Apollon should not be found to be protected by qualified immunity.

[14] The undersigned notes that the Moving Defendants have not argued that Plaintiff's negligent infliction of emotional distress claim should be dismissed because it is not "separate and distinct from his intentional tort claims." *Cotton v. District of Columbia*, 541 F. Supp. 195, 209 (D.D.C. 2008) (dismissing a negligent infliction of emotional distress claim where, "although adding the word 'negligence,' th[e] claim merely reiterate[d] prior allegations of intentional conduct"); *see also, e.g.*, *Harris v. U.S. Dep't of Veterans Affs.*, 776 F.3d 907, 916 (D.C. Cir. 2015) (finding the plaintiff had failed to properly plead a claim for negligent infliction of emotional distress where he failed to distinguish between negligent and intentional acts and noting that "[m]erely using the term negligence does 'not raise a cognizable claim of negligence'" (quoting *District of Columbia v. Chinn*, 839 A.2d 701, 708 (D.C. 2003))); *Lewis v. District of Columbia*, 768 F. Supp. 3d 76, , 131 (D.D.C. 2025) (dismissing the plaintiffs' negligent infliction of emotional distress claim where it was "premised on the same allegations of intentional misconduct underlying [their] false arrest, intrusion upon seclusion, intentional infliction of emotional distress, and assault and battery claims"). Significantly, courts have applied the requirement that a "negligence claim must stand on its own" even where intentional and negligent torts are pleaded in the alternative. *Roe v. Doe*, 401 F. Supp. 3d 159, 167 (D.D.C. 2019); *see id.* at 167–68 (dismissing a negligence claim that was pleaded in the alternative to an assault and battery claim because "[a]lthough pleading the[] claims in the alternative is acceptable, the negligence claim must stand on its own"); *see also Hawkins v. Wash. Metro. Area Transit Auth.*, 311 F. Supp. 3d 94, 106 (D.D.C. 2018) ("While there is no inherent inconsistency in allowing a plaintiff to plead multiple theories of liability, one cannot plead the same theory under a variety of labels under District of Columbia law."). Here, Plaintiff would appear to have acknowledged that his negligent infliction of emotional distress claim is based on the same factual allegations as his intentional infliction of emotional distress claim (and, indeed, his common law assault and battery claim): he insists that he "has plausibly pled a[] [negligent infliction of emotional distress] claim based on Defendant Apollon's intentional and alternatively negligent acts of cuffing him too tightly, refusing to remove or loosen the cuffs, and laughing at him as he lay there bleeding and

*id.*, ¶¶ 172–173.  Both also allege that the District of Columbia is liable for Apollon's conduct under the doctrine of *respondeat superior.  See id.*, ¶¶ 160, 174.

1.      Intentional Infliction of Emotional Distress

"To establish a prima facie case of intentional infliction of emotional distress, a plaintiff must show '(1) extreme and outrageous conduct on the part of the defendant[], which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress.'"  *Salem Media Grp., Inc. v. Awan*, 301 A.3d 633, 656 (D.C. 2023) (quoting *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1260 (D.C. 2016)).

a.      Extreme and Outrageous Conduct

"The question of 'whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery' requires a demanding showing that is a threshold question for the court."  *Id.* at 657 (quoting *Drejza v. Vaccaro*, 650 A.2d 1308, 1316 (D.C. 1994)). The conduct "must have been 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'"  *Cotton v. District of Columbia*, 541 F. Supp. 2d 195, 206 (D.D.C. 2008) (quoting *Larijani v. Georgetown Univ.*, 791 A.2d 41, 44 (D.C. 2002)).  Or, in the words of the Restatement (Second) of Torts, the conduct must be such that "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"  Restatement (Second) of Torts § 46 cmt. d (Am. Law. Inst. 1965).  "The '"extreme and outrageous" standard for intentional infliction of emotional distress is different from, and more exacting than, the "reasonableness" standard used for evaluating claims of

---

restrained."  ECF No. 15 at 25.  However, because the Moving Defendants have not suggested this as a basis for dismissal, the undersigned does not analyze it further and expresses no opinion on whether such an argument would succeed.

excessive force.'" *Bushrod v. District of Columbia*, 521 F. Supp. 3d 1, 30 (D.D.C. 2021) (quoting *Kotsch v. District of Columbia*, 924 A.2d 1040, 1046 n.5 (D.C. 2007)). Only a particularly egregious case of excessive force "can constitute outrageous behavior such that it satisfies a claim of intentional infliction of emotional distress." *Harris v. U.S. State Dep't of Veterans Affs.*, 776 F.3d 907, 917 (D.C. Cir. 2015); *see also Jackson v. District of Columbia*, 327 F. Supp. 3d 52, 70 (D.D.C. 2018) ("Only a '"*serious* case of excessive force"' can amount to actionable 'outrageous behavior.' Something more than a run-of-the-mill excessive-force claim is required." (emphasis in original) (quoting *Harris*, 776 F.3d at 917)).

The conduct Plaintiff alleges here is not sufficiently outrageous to support a claim for intentional infliction of emotional distress. Plaintiff bases this count on his allegations that, while taking Plaintiff to the hospital for treatment of injuries inflicted by the Defendant SPOs, Apollon removed the handcuffs placed by the SPOs, replaced them with a pair that was fastened too tight, refused to loosen them when asked, "and instead laughed at [Plaintiff] as he lay there cuffed and bleeding." ECF No. 15 at 24; *see also* ECF No. 10, ¶¶ 40–41. He complains that Apollon "mocked him and showed indifference to his pain." ECF No. 15 at 24. While, if true, that conduct is deserving of reprimand, it is not sufficiently outrageous to establish an intentional infliction of emotion distress. First, as to Apollon's laughter, "liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." Restatement (Second) of Torts § 46 cmt. d (Am. Law. Inst. 1965). Although Apollon's laughter and indifference "could be construed as harsh, insensitive, and certainly unprofessional" it cannot be said to constitute police conduct that is so "extreme, outrageous and [such] an abuse of authority" that it ventures "beyond all possible bounds of decency" and could be "regarded as atrocious, and utterly intolerable in a civilized community." *Halcomb v. Woods*, 610 F. Supp. 2d 77, 80, 83 (D.D.C. 2009); ; *cf. Drejza*,

650 A.2d at 1310, 1310 n.3, 1316–17 (finding a police officer's "contemptuous" treatment of woman reporting her rape, which included "continuously laugh[ing] at her, snicker[ing] whenever prior sexual activity on her part came up in the discussion, treat[ing] her with derision, . . . bull[ying] her into initially declining to press charges," and "laugh[ing] at her because she was not a virgin," was "near [enough to] the bounds of indecency that the question . . . whether it [was] actionably outrageous [was] properly left to the jury" (ellipses in original) (quoting *Meiter v Cavanaugh*, 580 P.2d 399, 401 (Colo. Ct. App. 1978))).

The same is true of Apollon's failure to loosen Plaintiff's handcuffs.  For example, in *Hall v District of Columbia*, the court dismissed on the pleadings the plaintiff's intentional infliction of emotional distress claim alleging that law enforcement "falsely arrest[ed] a young female, without probable cause at all, and in the process slamm[ed] that woman, who was not resisting in any way, against a wall, and handcuff[ed] her so tightly that her wrist [was] fractured," finding such conduct insufficiently extreme and outrageous.  73 F. Supp. 3d 116, 121 (D.D.C. 2014) (first and fourth alterations in original) (quoting the record).  Similarly, allegations that a police officer put the plaintiff, who had been in a brawl with a civilian but was complying with orders from law enforcement, in an illegal chokehold causing difficulty breathing and ultimately breaking his jaw did not rise to the level of conduct that would "arouse [the] resentment" of an average community member "and lead him [or her] to exclaim 'Outrageous!'"  *Smith v. District of Columbia*, 882 A.2d 778, 790–91, 794 (D.C. 2005) (alterations in original) (quoting *Lirajani*, 791 A.2d at 44).  A court in the Northern District of Illinois has dismissed a claim for intentional infliction of emotional distress where the plaintiff alleged "that the Officers put the handcuffs on her too tight, ignored her pleas to be allowed to provide proof of insurance, and placed her in the back seat of the police car, where she defecated on herself," finding that, although the allegations might "ultimately be proven

to amount to excessive force, they d[id] not amount to extreme and outrageous conduct for pur-poses of [intentional infliction of emotional distress]." *Romando v. City of Naperville*, No. 20 C 2701, 2021 WL 1853304, at *4 (N.D. Ill. May 10, 2021).  A court in the Eastern District of Mich-igan has found allegations that an officer handcuffed an individual too tightly while executing a search warrant at her home, called her fat and a bitch, and threatened to "blow [her] head off" were "reprehensible" but did "not rise to the level of extreme and outrageous."  *McGrew v. Duncan*, 333 F. Supp. 3d 730, 743 (E.D. Mich. 2018), *aff'd in part, dismissed in part, and remanded in part on other grounds*, 937 F.3d 664 (6th Cir. 2019).

Plaintiff asserts that this case is like *Jackson*, where the court allowed a claim of intentional infliction of emotional distress to go forward where the plaintiff asserted that, after he had been taken down by a "leg sweep," blinded by pepper spray, and handcuffed, two officers continued to "beat him for no reason as he lay subdued on the ground, trying to shield himself from the blows." 327 F. Supp. 3d at 58, 64–65, 70.  But Plaintiff does not allege a situation in which, having been subdued, law enforcement continued to actively beat him as in *Jackson*.  *See also McKnight v. District of Columbia*, 412 F. Supp. 2d 127, 137 (D.D.C. 2006) ("At worst, Officer Martin shot the Plaintiff knowing he was unarmed, planted a gun, and then proceeded to kick the Plaintiff in the side.  Construing the evidence in the light most favorable to the Plaintiff, a reasonable jury could find that kicking an unarmed young man, who was laying on the ground after having been shot without justification by the very police officers charged with protecting the community, is utterly [i]ntolerable in a civilized society.").  Indeed, Plaintiff himself characterizes Apollon's conduct as "indifference" and "callous[ness]" rather than active and gratuitous violence.  ECF No. 15 at 24. "Cases in which judges and juries must make nice judgments about the outrageousness (or lack thereof) of a defendant's conduct are intensely fact-bound."  *Drezja*, 650 A.2d at 1317.  Here, the

undersigned finds the alleged facts are insufficiently outrageous to support a claim for intentional infliction of emotional distress.

b.    Severe Emotional Distress

"'Severe emotional distress' for purposes of a[n] [intentional infliction of emotional distress] claim is a high bar.  It 'requires a showing beyond mere "mental anguish and stress" and must be "of so acute a nature that harmful physical consequences are likely to result."'" *Thompson v. Trump*, 590 F. Supp. 3d 46, 121–22 (D.D.C. 2022) (*quoting Competitive Enter. v. Mann*, 150 A.3d 1213, 1261 (D.C. 2016)), *aff'd sub nom. Blassingame v. Trump*, 87 F.4th 1 (D.C. Cir. 2023). Put another way, the emotional distress must be "greater than a reasonable person could be expected to tolerate." *Kitt v. Capital Concerts, Inc.*, 742 A.2d 856, 862 (D.C. 1999).

Plaintiff points to his allegations that (1) "[t]he incident was so traumatizing that it is painful for [him] to discuss it," (2) "he has been unable to work in construction"—his "primary line of work"—"since the incident due to his physical injuries," and (3) he "has resorted to donating blood plasma to financially provide for his two [young] sons . . . despite his fear of needles"; he insists, "[t]hat is enough."  ECF No. 15 at 11, 25–26.

It is not enough.  The only "emotional distress" he describes is pain at discussing the incident.  Perhaps there is distress traceable to being unable to work in construction and having to resort to donating plasma despite alleged fear of needles, but he offers no particulars of it.  In any case, "[m]ental distress," like feeling "embarrassed, threatened, and demeaned," is insufficient. *Davis v. Megabus Ne. LLC*, 301 F. Supp. 3d 105, 113–14 (D.D.C. 2018) (quoting *Crowley v. N. Am. Telecomms. Ass'n*, 691 A.2d 1169, 1172 (D.C. 1997)).  Rather, courts have required allegations that plaintiffs suffered symptoms of emotional distress "like a loss of sleep or inability to concentrate." *Ortberg v. Goldman Sachs Grp.*, 64 A.3d 158, 164–65 (D.C. 2013) (collecting

cases).  Some cases have set the bar even higher.  For example, in *Wood v. Neuman*, the court

found "evidence that [the plaintiff] was 'horrified' at [the defendant's] destruction of her garden,

was constantly crying and almost sleepless, was shaken at her arrest, and was embarrassed at hav-

ing been made out to be a 'pariah' in the neighborhood" did not "show that [her] emotional con-

dition was 'so acute that harmful physical consequences might result.'" 979 A.2d 64, 78 (D.C.

2009) (quoting *Sterling Mirror of Md., Inc. v. Gordon*, 619 A.2d 64, 67 (D.C. 1993)).

 Oddly, Plaintiff does not cite as evidence of his emotional distress the allegation that he is

fearful and anxious when he sees MPD officers.  *See* ECF No. 10, ¶ 159.  At least one case—also

not cited by Plaintiff—has numbered an "abiding fear of police officers" as a component of suffi-

ciently debilitating emotional distress, but there it was coupled with fear of venturing outside at

night and symptoms of emotional distress "so severe that [the plaintiff] . . . had difficulty at work."

*Chen v. District of Columbia*, 256 F.R.D. 267, 273 (D.D.C. 2009).  Plaintiff here makes no similar

allegations—instead, he acknowledges that any difficulties regarding work are a consequence not

of emotional disturbance, but of his "physical injuries."  ECF No. 15 at 26.  In short, Plaintiff's

allegations of emotional distress are not robust enough to support a claim of intentional infliction

of emotional distress.

*      *      *      *      *

 Because Plaintiff has failed to allege facts plausibly suggesting outrageous conduct or se-

vere emotional distress, the undersigned recommends dismissing Count Ten.

### 2. Negligent Infliction of Emotional Distress

 To state a claim for negligent infliction of emotional distress, a plaintiff must plead "(1)

that [Defendant] acted negligently, (2) that [he] suffered either a physical impact or [was] within

the 'zone of danger' of the [Defendants'] actions, and (3) that [he] suffered emotional distress that

39

was 'serious and verifiable.'" *Johnson v. Metro. Direct Prop. & Cas. Ins. Co.*, No. 18-cv-1715, 2018 WL 4964504, at *4 (D.D.C. Oct. 15, 2018) (alterations in original) (quoting *Wright v. United States*, 963 F. Supp. 7, 18 (D.D.C. 1997)).

The parties disagree about whether Plaintiff has sufficiently alleged (1) that Apollon placed Plaintiff in the zone of physical danger providing an objectively reasonable basis for Plaintiff's alleged fear for his safety and (2) serious and verifiable emotional distress. *See* ECF No. 14 at 12–13; ECF No. 15 at 24–26. But, as noted above, the cause of action at issue requires *either* that the plaintiff "suffered . . . a physical impact" *or* that he was "within the 'zone of danger.'" *Johnson*, 2018 WL 4964504, at *4 (quoting *Wright*, 963 F. Supp. at 18); *see also Clark v. Comput. Sci. Corp.*, 958 F. Supp. 2d 208, 213 (D.D.C. 2013) ("To support a claim of negligent infliction of emotional distress, plaintiff may show that defendants caused him direct physical injury *or* placed him in a 'zone of physical danger' that caused him serious emotional distress." (emphasis added) (quoting *District of Columbia v. McNeill,* 613 A.2d 940, 943 (D.C.1992)); *see also McNeill*, 613 A.2d at 943 ("[A] plaintiff can recover for the separate tort of negligent infliction of emotional distress if the distress results from a direct physical injury *or* if 'plaintiff was in the zone of physical danger and was caused by defendant's negligence to fear for his or her own safety,' *or* if the plaintiff is 'physically endangered' as a result of the defendant's negligence." (emphasis added) (citations omitted) (quoting *Williams v. Baker*, 572 A.2d 1062, 1067, 1073 (D.C. 1990) (en banc))).

That makes sense. In *Williams v. Baker*, the en banc D.C. Court of Appeals addressed, among other things, "the basis for liability . . . for the negligent infliction of mental distress." 572 A.2d at 1064. It noted that D.C. courts had "long followed the rule that there can be no recovery for negligently inflicted mental suffering that is not traceable to a direct physical injury," which is known as the "impact rule." *Id.* at 1064, 1065. The court explained that "the theory behind the

impact rule is that the occurrence of a contemporaneous physical impact guarantees the genuineness of the mental distress." *Id.* at 1067.  However, it recognized that "[t]he vast majority of jurisdictions" had since abandoned (or failed to adopt) the impact rule in favor of the "zone of danger rule" adopted by the Restatement (Second) of Torts:

> If the actor's conduct is negligent as creating an unreasonable risk of causing bodily harm to another otherwise than by subjecting him to fright, shock, or other similar and immediate emotional disturbance, the fact that such harm results solely from the internal operation of fright or other emotional disturbance does not protect the actor from liability.

*Id.* at 1066 (quoting Restatement (Second) of Torts § 436(2) (Am. Law. Inst. 1965)).  In *Williams*, the D.C Court of Appeals adopted the Restatement view and held

> that if the plaintiff was in the zone of physical danger and was caused by defendant's negligence to fear for his or her own safety, the plaintiff may recover for negligent infliction of serious emotional distress and any resultant physical injury, regardless of whether plaintiff experienced a physical impact as a direct result of defendant's negligence.

*Id.* at 1067.  It reasoned that the rationale for the impact rule—that it guaranteed the authenticity of claimed mental distress—was undermined because "[d]ue to advances in medical research and improved diagnostic techniques, the presence of emotions such as grief, anxiety, and anger is frequently accompanied by physical indicia that are capable of objective proof." *Id.*  That is, the case did not require all negligent infliction of emotional distress plaintiffs to establish that they were in the zone of physical danger; rather, it expanded the liability of negligent actors to cover not only emotional distress suffered as a result of negligence that causes physical injury, but also emotional distress suffered as a result of negligence that places individuals in the zone of danger causing them to fear for their safety.  Or, to take a different tack and use the language of *Williams*, a plaintiff who suffers physical injury and attendant emotional distress through the negligence of the defendant was necessarily "in the zone of physical danger" caused by that negligence.

At this stage of the proceedings, the undersigned must draw all reasonable inferences from the facts alleged in Plaintiff's favor, *see Nurriddin*, 818 F.3d at 756, and as discussed above in Section III.B, Plaintiff has sufficiently alleged a physical injury from Apollon's handcuffing.  As he explains in his brief opposing the dismissal of this claim, he "proffered detailed factual allegations of not only the tight cuffs, but of . . . [his] fear, humiliation, significant pain, and suffering long after the incident, including stiffness, swelling, aches, and inability to feel his hands and inability to continue working" as a consequence of his "physical injuries."  ECF No. 15 at 25–26.  That distinguishes this case from *Kowalevicz v. United States*, on which the Moving Defendants rely.  There, the court dismissed the plaintiff's negligent infliction of emotional distress claim because the complaint "never allege[d] physical danger, only 'great physical discomfort[,] pain and suffering'" from too-tight handcuffs, which "[fell] short of alleging actual 'danger of physical injury.'"  *Kowalevicz v. United States*, 302 F. Supp. 3d 68, 78 (D.D.C. 2018) (second alteration in original) (first quoting the complaint; and then quoting *Williams*, 572 A.2d at 1066)).  That is, unlike Plaintiff here, the court found that the plaintiff in *Kowalevicz* had failed to allege either "that defendant[] caused him direct physical injury or placed him in a 'zone of physical danger' that caused him serious emotional distress."[15]  *Clark*, 958 F. Supp. 2d at 213 (quoting *McNeill*, 613 A.2d at 943).

---

[15] The undersigned acknowledges that one case in this district has stated, in response to an argument that the "'zone of danger' concept is not applicable" to a case in which the plaintiff "claims that he actually sustained injuries," that the zone of physical danger test applies "*regardless of whether plaintiff experienced a physical impact* as a direct result of defendant's negligence."  *Cobb v. Wash. Metro. Area Transit Auth.*, No. 20-cv-3522, 2021 WL 2935891, at *6 n.3 (D.D.C. July 13, 2021) (emphasis in original) (quoting *Williams*, 572 A.2d at 1067).  To the extent that *Cobb* stands for the proposition that a negligent infection of emotional distress plaintiff who has been physically injured and caused emotional distress through the defendant's negligence must make a separate showing that he was in the zone of danger created by that negligence, the undersigned disagrees based on the cases cited above.  *See Johnson*, 2018 WL 4964504, at *4; *Clark*, 958 F. Supp. 2d at 213; *McNeill*, 613 A.2d at 943.

     In any event, *Cobb* indicates that, if such a showing is necessary, Plaintiff has made it.  In *Cobb*, the court found that the plaintiff had sufficiently alleged he was in the zone of physical danger for the purposes of a negligent infliction of emotional distress claim when, after slipping in a Metro station and injuring his leg, employees of the Washington Metropolitan Area Transportation Authority ("WMATA") ignored his cries for help.  *See* 2021 WL 2935891, at *1, *6.  The court reasoned that "he reasonably would have feared that his ongoing failure to receive

More troublesome for Plaintiff is whether he has alleged "serious and verifiable" distress. *Jones v. Howard Univ., Inc.*, 589 A.2d 419, 424 (D.C. 1991). To clear that bar, a plaintiff must allege that his emotional distress "manifested in some concrete way, such as 'by an external condition or by symptoms clearly indicative of a resultant pathological, physiological, or mental state.'" *Thompson*, 590 F. Supp. 3d at 122 (quoting *Jones*, 589 A.2d at 424). This is, again, a difficult standard to meet. As the D.C. Circuit explained in *Jones* (the case that adopted the "manifestation" requirement into District of Columbia common law), "transitory, non-recurring physical phenomena, harmless in themselves, such as dizziness, vomiting, and the like" will not suffice where they "are in themselves inconsequential and do not amount to substantial bodily harm." *Jones*, 589 A.2d at 424 (quoting *Williams*, 572 A.2d at 1068). On the other hand, "long continued nausea or headaches may amount to physical illness, which is bodily harm," as may "long continued mental disturbance, as for example in the case of repeated hysterical attacks, or mental aberration." *Id.* (quoting *Williams*, 572 A.2d at 1068). Accordingly, courts have found that emotional distress manifested as "recurring nightmares, accompanying sleeplessness and crying spells over four years" sufficient. *David v. District of Columbia*, 436 F. Supp. 2d 83, 90 (D.D.C. 2006); *see also McNeill*, 613 A.2d at 944 (finding that evidence the plaintiff was "in shock," unable to sleep, and "suffer[ed] from recurring nightmares" satisfied the burden to show serious and verifiable distress); *but see Canty v. District of Columbia*, No. 21-cv-2067, 2022 WL 3646312, at *7 (D.D.C. Aug. 24, 2022) (finding that allegations of sleeplessness and depression were not sufficient to state a claim for negligent infliction of emotional distress).

---

prompt medical attention, attributable to WMATA's alleged failure to summon help for him, was exacerbating the injury he suffered when he fell," which "satisfie[d] not only the requirement that he fear for his safety but also the requirement that he was in the zone of physical danger." *Id.* at *6. Here, it is a tenable inference from the facts alleged—which include an allegation that Apollon's too-tight handcuffing caused Plaintiff to "fear for his safety," ECF No. 10, ¶ 158—that Plaintiff reasonably would have feared that Apollon's failure to loosen his handcuffs would cause or exacerbate an injury to his wrists.

Plaintiff's allegations of emotional distress—a reticence to discuss the incident, fear when he sees MPD officers, etc.—are not concrete manifestations by external conditions or symptoms "clearly indicative of a resultant pathological, physiological, or mental state." *Thompson*, 590 F. Supp. 3d at 122 (quoting *Jones*, 589 A.2d at 424). Rather, his allegations of emotional distress are less severe than those held insufficient in *Hawkins*. In that case, the plaintiff alleged that, after the side view mirror of a marked police vehicle hit the plaintiff's young daughter's arm, the officer got out of the vehicle, drew his gun, and pointed it at the plaintiff. *Hawkins*, 311 F. Supp. 3d at 99. The plaintiff asserted that the incident "left [him] in fear of his life," tore "his dignity" from him, made him "unable to feel safe while going outside" because he felt he was not being protected by the police force, instilled fear that another officer would "attack him and shoot him this time," and caused "emotional and psychological trauma." *Id.* at 108 (quoting the record). Those allegations were insufficient to state a claim. *See id.* Plaintiff, although contending that he has met the pleading standard, has failed to provide any case that would suggest he has.

Accordingly, the undersigned recommends dismissing Plaintiff's claim for negligent infliction of emotional distress.

## IV.    RECOMMENDATION

For the foregoing reasons, the undersigned recommends **GRANTING IN PART** and **DENYING IN PART** the Moving Defendants' Motion to Dismiss, ECF No. 14. Specifically, the Court should **GRANT** the motion as to Counts Six (assault and battery against the SPO Defendants, the District of Columbia, and Security Assurance Management), Eight (false imprisonment against the SPO Defendants, the District of Columbia, and Security Assurance Management), Nine (intentional infliction of emotional distress against the SPO Defendants, the District of Columbia, and Security Assurance Management), and Eleven (negligent infliction of emotional distress

against the SPO Defendants, the District of Columbia, and Security Assurance Management) to the extent they are alleged against the District of Columbia and dismiss Counts Ten (intentional infliction of emotional distress against Apollon and the District of Columbia) and Twelve (negligent infliction of emotional distress against Apollon and the District of Columbia) in their entirety. The Court should **DENY** the Motion to Dismiss as to Counts Five (excessive force against Apollon) and Seven (assault and battery against Apollon and the District of Columbia).

*        *        *        *        *

The parties are hereby advised that under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to the Amended Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Amended Report and Recommendation. The written objection must specifically identify the portion of the report and/or recommendation to which objection is made, and the basis for such objection. The parties are further advised that failure to file timely objection to the findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendations. *See Thomas v. Arn*, 474 U.S. 140 (1985).


Date: June 13, 2025                          _____
                                             G. MICHAEL HARVEY
                                             UNITED STATES MAGISTRATE JUDGE